Patricia McADOO, Appellant,

v.

Martin L. DIAZ, the Holy Family Cathedral, the Archdiocese of Anchorage, and the Western Dominican Province, Appellees.

No. S–5359.

Supreme Court of Alaska.

Nov. 25, 1994.

Phillip Paul Weidner and Elizabeth D. Friedman, Weidner & Associates, Inc., Anchorage, for appellant.

James M. Gorski, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellees.

Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J. Pro Tem.*

*OPINION*

COMPTON, Justice.

A parishioner volunteered in a local Catholic church as a weekend receptionist and a physical therapist for the parish staff. She also volunteered to serve in various charitable and lay ministries and served on the Pastoral Council. She filed a report with the State of Alaska alleging that the church's plans for an altar without a handrail constituted elder abuse or neglect under state law. The pastor of the church dismissed her from several of her volunteer positions. The pa-

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

rishioner sued, alleging that her dismissal violated the "whistleblower" protection of the elder neglect reporting statute, and that the pastor had defamed her in a dismissal letter. The trial court granted summary judgment for the pastor and the church. We affirm the dismissal of the statutory whistleblower claim, but remand for a determination of the defamation claim.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. FACTUAL HISTORY

#### 1. Genesis

Father Martin Diaz is an ordained Catholic priest. He has been the Pastor of Holy Family Cathedral in Anchorage since 1986. Patricia McAdoo is a licensed physical therapist. She has been an active member of Holy Family Cathedral since her arrival in Anchorage in 1982. She participates in various lay ministries within the church. She was elected to the Pastoral Council in 1986 and served on it until her dismissal in 1990. She serves as a lector and a lay Eucharist minister. From 1987 to 1990, she worked as a volunteer receptionist on Saturdays for Father Diaz, answering the phones and performing other church administrative duties. Ms. McAdoo also worked as a volunteer physical therapist for the Holy Family staff, including Father Diaz. She volunteers in other charitable ministries as well. She has never been compensated for her activities.

The relationship between Father Diaz and Ms. McAdoo has been difficult. She describes the relationship as "dynamic" and admits that they have "scrapped" and "nipped" at each other since he became Pastor. He states that she treats him in "an abusive and vindictive manner" and that they "occasionally clashed on numerous matters involving the operation of the Parish."

As a licensed physical therapist, Ms. McAdoo is required by law to report promptly instances of elder abuse or neglect. AS 47.24.010(a)(1). An employer or supervisor of a person reporting elder neglect, or an entity providing benefits, services or housing to the reporting person, may not retaliate against the reporting person. AS 47.24.010(h). These statutory obligations and protections form the legal framework for the final deterioration of the relationship between Ms. McAdoo and Father Diaz.

Father John Fearon, an elderly priest at Holy Family Cathedral, was hospitalized for transient ischemia in 1987. Ms. McAdoo provided volunteer physical therapy services for Father Fearon during his recovery. On Father Fearon's release, she recommended that Father Diaz make physical changes in the rectory to accommodate Father Fearon's weakened condition, including removing throw rugs from the bathroom, installing grab bars near the toilet and bathtub, and installing handrails on the stairs. Father Diaz resisted these changes. When Ms. McAdoo threatened to report the church for elder neglect, Father Diaz relented and the changes were made.

Later Father Diaz discussed with the Pastoral Council plans to renovate the altar. At the meeting, Ms. McAdoo stated that Father Fearon would need a handrail on the altar. As the plans progressed, Ms. McAdoo reminded Father Diaz of the need for a handrail. At a meeting on October 10, 1990, she again brought up the subject. Father Diaz stated, "I am tired of hearing about the handrail and there is not going to be a handrail." Ms. McAdoo threatened to report to the State that the plans for an altar without handrails constituted elder neglect. Father Diaz reiterated that there would be no handrails.

The next day, Ms. McAdoo called the Division of Family and Youth Services (DFYS) and asked if she was obligated to disclose elder neglect discovered in a volunteer capacity. The representative responded that she was required to do so if her services were "uniquely professional in nature and differing significantly from those which could reasonably be expected from an instructed and motivated family member." Ms. McAdoo made an allegation of neglect to DFYS later that day. A representative investigated the allegation and recommended state intervention on Father Fearon's behalf.

## 2. Exodus

On October 17, Father Diaz left a message on Ms. McAdoo's answering machine asking her to resign from the Pastoral Council. She later was told not to report for her regular volunteer receptionist work.[1]  On October 24, Ms. McAdoo met with Father Diaz and Mr. McLean, the President of the Pastoral Council. When she refused to resign, Father Diaz dismissed her from the Pastoral Council. Father Diaz sent a letter to Ms. McAdoo and other members of the Pastoral Council citing an inability to work together, and specifically referring to Ms. McAdoo's report to DFYS. Ms. McAdoo remains active in other church activities. Father Diaz distinguishes the receptionist and Pastoral Council positions from Ms. McAdoo's other volunteer activities

because the former require close interaction between the two antagonists.

## B. PROCEDURAL HISTORY

Ms. McAdoo filed suit against Father Diaz, the Holy Family Cathedral, the Archdiocese of Anchorage, and the Western Dominican Province for statutory retaliation, defamation, and outrageous conduct. The defendants moved to dismiss and for summary judgment. Following oral argument, the court granted the defendant's motion from the bench.[2] It held that the "whistleblower" section of the elder abuse statute did not protect volunteers, stating "[t]he claims asserted by the plaintiff, and the facts surrounding those claims, do not bring her within the class of persons protected by [AS

---

1. Ms. McAdoo asserted in her complaint and affidavit that she was left off the lector and Eucharist minister schedules for January, 1991. Father Diaz asserts in his answering affidavit that she is actively involved in these and other lay ministries. In her appellate briefs, she has not argued retaliatory dismissal from her lector and lay Eucharist minister positions. We conclude that arguments based on these two allegations have been waived.

2. It is not clear from the motion or the order granting the motion whether the suit was dismissed under Alaska Civil Rule 12(b) or summary judgment was granted under Rule 56. If the court considered materials outside the pleadings, the motion was automatically converted to a motion for summary judgment. Alaska R.Civ.P. 12(b). In *Martin v. Mears*, 602 P.2d 421, 426 (Alaska 1979), we stated "in the future all trial courts must expressly state whether they have in fact excluded or considered" materials beyond the pleadings. We have been less than successful in getting the trial courts to follow this commandment. *See Andrews v. Wade & De Young*, 875 P.2d 89, 90–91 (Alaska 1994); *Homeward Bound, Inc. v. Anchorage Sch. Dist.*, 791 P.2d 610, 611–12 (Alaska 1990); *Brice v. State*, 669 P.2d 1311, 1313–14 (Alaska 1983); *Douglas v. Glacier State Tel. Co.*, 615 P.2d 580, 590 (Alaska 1980). The primary purpose behind our concern in *Martin* was the possibility of prejudice to the nonmoving party from an unannounced conversion to summary judgment. Under Rule 12(b), "all parties shall be given reasonable opportunity to present all material made pertinent" by the conversion. In the present case, the motion gave notice that summary judgment was contemplated and Ms. McAdoo submitted a competing affidavit in opposition. There was no prejudice to Ms. McAdoo from the trial court's imprecise description of its action. *See Douglas*, 615 P.2d at 590.

In addition, we are not convinced that the distinction significantly affects appellate review. Both the summary judgment procedure and the motion for judgment on the pleadings are concerned with the substance of the parties' claims and defenses and are directed towards a final judgment on the merits. Indeed, the standard applied by the court appears to be identical under both motions. All factual inferences and intendments are taken against the moving party and the motion is not granted unless the movant is entitled to judgment as a matter of law.... Any possible distinction between the [scope of the] two motions ... was eliminated by the 1948 amendment to Rule 12(c), which provided that if material outside the pleadings is presented on the motion, the court may consider it and treat the motion as if it had been brought under Rule 56.

5A Wright & Miller, *Federal Practice and Procedure* § 1369, p. 535 (1990).

In *Martin*, we noted three options are available where the superior court has failed to treat a Rule 12(b) motion as a motion for summary judgment where matters outside the pleadings were considered. We may remand, review as a dismissal, or review as a summary judgment. *Martin*, 602 P.2d at 427. We held that reversal was warranted whether the decision was treated as a dismissal or summary judgment. *Id.* Although subsequent decisions repeat these three options, the decisions usually apply the summary judgment standard of review. *Homeward Bound*, 791 P.2d at 612; *Brice*, 669 P.2d at 1314; *Douglas*, 615 P.2d at 590. We see little utility in remanding for clarification and little effective difference between reviewing this matter as a dismissal or as a summary judgment in the absence of prejudice to either party.

§ 47.24.010 and] the defendants are protected from the claims asserted by the plaintiff by" the federal and state constitutions. The court rejected Ms. McAdoo's argument that she was a public interest litigant and ordered her to pay $5,015, representing fifty percent of the defendants' attorney's fees.

## II. *DISCUSSION*

■ The scope of the elder neglect statute is a question of statutory interpretation to which this court applies its independent judgment. *Summerville v. Denali Center,* 811 P.2d 1047, 1049–50 (Alaska 1991).

### A. AS 47.24.010 DOES NOT COVER THE INTANGIBLE BENEFITS OF VOLUNTEERING.

Alaska Statute 47.24.010 provides in part:

(a) The following persons who, in the performance of their professional duties, have reasonable cause to believe that an elderly person has suffered harm shall, not later than 24 hours after first having cause for the belief, report the harm to the Department of Health and Social Services:

(1) a physician or other licensed health care provider;

.   .   .   .   .

(c) A person who fails to comply with this section is guilty of a violation.

.   .   .   .   .

(h) If a person makes a good faith report of harm under this section, *an employer or supervisor of the person, or a public or private agency or entity that provides benefits, services, or housing to the person, may not discharge, demote, transfer, reduce the pay or benefits or work privileges of, prepare a negative work performance evaluation of, deny or withhold benefits or services, evict or take other detrimental action against the person* because of the report. The person making the report may bring a civil action for compensatory and punitive damages against an employer, supervisor, agency, or entity that violates this subsection. In the civil action there is a rebuttable presumption that the detrimental action was retaliatory if it was taken within 90 days after the report of harm was made.

(Emphasis added).

■ The parties do not dispute that Ms. McAdoo is a "licensed health care provider" who made a good faith report under the statute. Ms. McAdoo argues that the defendants are "private entities" who have deprived her of the "benefit" of serving as a volunteer receptionist and member of the Pastoral Council. She also argues that Father Diaz took other "detrimental action" against her. Father Diaz responds that these benefits are "intangible" and "essentially religious fulfillment." Under Ms. McAdoo's theory, the statute forbids any adverse action by anyone. She argues that subsection (h) "prevents *anyone,* including a private agency or entity that provides *any* type of benefit or service to the person who makes a good faith report of elder abuse and/or neglect from taking *any* type of detrimental action in retaliation against the person." She interprets the statute to protect her right to confer gratuitously services upon the church. We conclude that this interpretation sweeps too broadly.

In 1983 the Alaska Legislature passed legislation for the prevention of elder abuse and neglect. Ch. 36, § 2, SLA 1983. The act required certain persons, including "a physician or other licensed health care provider," to report promptly elder abuse or neglect to a state agency, required the agency to take prompt action on the report, and assured that the act of reporting could not be the basis of civil or criminal liability. AS 47.24.010(a)(1), (f), .020(a). At its inception, the statute contained no section proscribing retaliation for a report.

In 1987 Congress passed legislation requiring that each state establish a "State Long–Term Care Ombudsman" to monitor the status of the elderly in nursing homes and other long-term care programs. Older Americans Act Amendments of 1987, Pub.L. No. 100–175 § 129(d)(12)(J)(ii), 101 Stat. 926, 937 (1987). Congress required that each state "prohibit retaliation and reprisals by a long-term care facility or other entity with respect to any resident, employee, or other person for filing a complaint with [the Ombudsman

and] provide for appropriate sanctions." 42 U.S.C.A. § 3058g(j)(2)–(3) (West 1994 Supp.).

In 1988 the Alaska Legislature addressed the new requirements by introducing Senate Bill (S.B.) 442. 1988 Sen.Journal 2276–77. The primary purpose of S.B. 442 was to establish the office of the Long–Term Care Ombudsman to protect Alaskans living in long-term care facilities, such as nursing homes. Sen.State Aff.Comm., Mar. 2, 1988, Side B, No. 485–515. The Bill implemented the federal requirements to bar retaliation for reports made to the Long–Term Care Ombudsman. In addition, the Bill added a new section on retaliation to the more general elder abuse and neglect statute. The language of each of the proposed sections prohibiting retaliation was identical, proscribing retaliation by an "employer or supervisor" for workplace reprisals or "other detrimental actions." [3]

The Senate State Affairs Committee took testimony and made a number of changes to the Bill. After the Committee had approved certain amendments and was preparing to release the Bill, the following additional testimony was taken.

> Mr. Chairman, [this is] Duncan Fowler of the Ombudsman's office. [There is] one other place where I think that you might be able to strengthen the bill[.] From time to time we have allegations that clients or people who are receiving services from certain agencies are being intimidated or being threatened [with losing] services or this kind of thing. May I suggest ... inserting 'or agency serving a client' [after 'employer or supervisor'].

Sen.State Aff.Comm., Mar. 21, 1988, Side B, No. 175–95.

After reference to different drafts and questions from the Committee, Mr. Fowler stated, "It is my belief that [this would] make it very difficult for an *owner of a nursing home* to ... take some action against a *patient in the nursing home* because they ... filed a complaint with your Long–Term Care Ombudsman." Sen.State Aff.Comm., Mar.

21, 1988, Side B, No. 240–50. The final Committee added "or a public or private agency or entity that provides benefits, services, or housing to the person" after "employer or supervisor," and added "deny or withhold benefits or services, [or] evict" to the list of proscribed retaliatory actions. This language was added to the retaliation subsections of both the ombudsman and the general elder neglect statutes. *Compare* AS 44.21.237(b) *with* AS 47.24.010(h).

The legislative history of AS 47.24.010 indicates that the legislature limited the scope of the statute by identifying and protecting certain relationships between the reporting person and the retaliating person. The original bill protected only the employment relationship. The state has a significant interest in protecting employees from unfair firing. *See Mitford v. de Lasala*, 666 P.2d 1000, 1007 (Alaska 1983). Many whistleblower statutes protect only this important relationship. *See, e.g.*, 10 U.S.C. § 2409 (1988 Supp.) ("An *employee* of a defense contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing ... a substantial violation of law related to a defense contract.") (emphasis added); 12 U.S.C.A. § 1831j (West Supp.1994) ("No insured depository institution may discharge or otherwise discriminate against any *employee* with respect to compensation, terms, conditions, or privileges of employment" for a report of a "violation of any law.") (emphasis added).

The amendment sought to protect the elderly in nursing homes from retaliatory withdrawal of housing or other benefits or services. The state has a significant interest in assuring that its citizens have fair access to housing. *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 282–83 (Alaska 1994), *cert. denied*, —— U.S. ——, ——, 115 S.Ct. 460, ——, 130 L.Ed.2d 368, 63 U.S.L.W. 3341, 3345 (U.S. Oct. 31, 1994) (No. 94–169).

However, nothing in the legislative history or text of the statute supports the broad

---

**3.** "An employer or supervisor of a person who, in good faith, makes a report of harm under this section may not discharge, demote, transfer, reduce pay or benefits or work privileges of, pre-

pare a negative work performance evaluation of, or take other detrimental action against the person because of the report." S.B. 442 15th Leg., 2nd Sess. (February 19, 1988).

reading urged by Ms. McAdoo. We have not been directed to any whistleblower statute that protects the reporting party from *any* negative reaction by *any* person on the basis of the report.[4] The statute protects against retaliatory action in the context of certain important relationships between the reporting and retaliating party. Protected relationships include employment and situations where the retaliating party provides substantial tangible benefits to the whistleblower. AS 47.24.010 does not protect the intangible benefits of volunteering.[5] The statute creates no right to continued altruism.

Because we hold that Ms. McAdoo has no statutory claim, we do not reach the argument that application of the statute violates Father Diaz's rights under the free exercise of religion clauses of the state and federal constitutions. *See National Labor Relations Board v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). However, we must determine whether her defamation claim against Father Diaz can stand in the face of these clauses.

### B. MS. MCADOO'S DEFAMATION CLAIM IS NOT BARRED BY THE STATE OR FEDERAL CONSTITUTIONS.

In *Marshall v. Munro,* 845 P.2d 424, 427–28 (Alaska 1993), we held that a cause of action against a minister could proceed only if the elements of the claim did not require the court to evaluate the qualifications of the minister or interpret church dogma. The claim that the minister had defamed the plaintiff was found to have only secular elements. *Id.* at 428–29. Ms. McAdoo has asserted six causes of action. The first claim is for statutory retaliation, which we rejected *supra.* Her second claim is for libel in the dismissal letters and the third is for unspecified slander. Slander and libel are both forms of defamation. Restatement (Second) of Torts § 568 (1977).

To create liability for defamation there must be:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Restatement (Second) of Torts § 558 (1977).

Father Diaz may assert truth or privilege as a defense. Privilege, truth, and damage appear to be the most likely areas of contention in this case. If Father Diaz made the allegedly defamatory statements within the scope of his duties as a Pastor, he has a conditional privilege to speak. *Marshall,* 845 P.2d at 428 & n. 4. Ms. McAdoo must then show that Father Diaz made the statements with a reckless disregard for their truth. Although the privilege determination requires some general inquiry into the duties of a pastor, it does not touch the merits of any core religious questions. Similarly, a determination of whether the statements were true and the amount of damage to Ms. McAdoo's reputation does not present a religious

---

4. We express no view as to whether such an all-encompassing statute would violate the personal rights of association and disassociation. *See* Laurence H. Tribe, *American Constitutional Law* 1010–22 (2d ed. 1988).

5. Philosophers, economists, and legal theorists have struggled with a theoretical motivation for altruism. It does not fit neatly into the traditional conservative view that all humans act rationally for their own self-interest. Under this view, a person volunteers to do good for others without expectation of direct benefit for one of two reasons: (1) the rational expectation of actual, but less tangible benefits, such as an increased standing in the community or an expectation of reciprocal acts of kindness from the recipient, or (2) because of a hypothetical "psychic income" to the volunteer generated by the act of doing good. Jeffrey L. Harrison, *Egoism, Altruism, and Market Illusions: The Limits of Law and Economics,* 33 U.C.L.A.L.Rev. 1309, 1316–19 (1986). Opposing philosophical views allow for the possibility that rational humans can perform altruistic acts out of simple kindness or a commitment to family, society, or creator. *See* John Rawls, *A Theory of Justice* (1971). Ms. McAdoo suggests that she volunteered to enhance "her standing within both the religious *and* her secular, professional community." Her record of charitable acts suggests that her motives were selfless. But even if she acted selfishly to gain the intangible benefits of volunteering, these benefits are beyond the scope of the whistleblower statute.

question. Therefore, we remand the case to the trial court to consider the merits of Ms. McAdoo's defamation claims.[6] Because the trial court appears not to have reached her claims of intentional infliction of emotional distress, outrage, and failure to rectify the acts of others, we express no opinion on the factual or legal validity of these claims.[7]

## III. *CONCLUSION*

Dismissal of Ms. McAdoo's claim under AS 47.24.010(h) is AFFIRMED. Dismissal of Ms. McAdoo's defamation claims is RE-VERSED and REMANDED. The award of attorney's fees against Ms. McAdoo is VA-CATED.

---

**6.** At oral argument, Ms. McAdoo's counsel twice admonished the court to "[not] give us half a loaf." We decline to treat this admonition as a waiver of Ms. McAdoo's non-statutory claim.

**7.** The basis for the defamation claims is a letter Father Diaz distributed to the members of the Pastoral Council. In the letter, he asserts that Ms. McAdoo has been "abusive and vindictive" toward him for at least two years and that the last time Ms. McAdoo "attended counseling with someone from the parish it turned very negative very quickly." Ms. McAdoo also cites a number of occurrences after the dismissals to support her claims of intentional infliction of emotional distress, outrage, and failure to rectify the outrageous acts of agents. She says that (1) Father Diaz and Mr. McLean refused to take her phone calls before their meeting with her, (2) Father Diaz said, "Well, excuse you," after Ms. McAdoo had a coughing attack during a sermon, (3) Father Diaz sang the words "power to the laity" on one occasion when he saw her, (4) and Mr. and Mrs. McLean moved away from her in church.