# IN THE SUPREME COURT OF TEXAS

No. 20-0127

IN RE DIOCESE OF LUBBOCK

ON PETITION FOR WRIT OF MANDAMUS

JUSTICE BOYD, dissenting.

The Catholic Church has publicly confessed that a "culture of abuse" existed within its communities.[1] With "sorrow and shame," Pope Francis personally acknowledged "the atrocities perpetrated by consecrated persons, clerics, and all those entrusted with the mission of watching over and caring for those most vulnerable."[2] He also conceded that, beyond the abuse itself, the victims' pain "was long ignored, kept quiet or silenced."[3]

But now, the church has pledged to publicly "condemn these atrocities and join forces in uprooting this culture of death."[4] It has promised to extend "an outstretched hand" to the victims "and rescue them from their pain."[5] And it has committed itself to a "penitential openness that can

---

[1] *Letter of His Holiness Pope Francis to the People of God*, THE HOLY SEE (Aug. 20, 2018), http://www.vatican.va/content/francesco/en/letters/2018/documents/papa-francesco_20180820_lettera-popolo-didio html.

[2] *Id.*

[3] *Id.*; *cf.* Heather McAdams, *Holding the Catholic Church Responsible on an International Level: The Feasibility of Taking High-Ranking Officials to the International Criminal Court*, 53 N.Y.U. J. INT'L L. & POL. 229, 230 (2020) (describing "the Catholic Church's history of covering up the sexual abuse of minors committed by its clergy").

[4] *Letter of His Holiness Pope Francis to the People of God*, *supra* note 1.

[5] *Id.*

allow [the church] to be renewed from within."[6] Unfortunately, that commitment to "openness" led to the filing of this lawsuit.

Consistent with the Holy Father's commitment, the United States Conference of Catholic Bishops issued a Charter for the Protection of Children and Young People, requiring that all U.S. Catholic Dioceses "be open and transparent in communicating with the public about sexual abuse of minors by clergy within the confines of respect for the privacy and the reputation of the individuals involved."[7] Pursuant to this directive, the Texas Dioceses undertook to investigate all allegations of sexual abuse of a minor by a clergy member and to publish lists of all such persons against whom a "credible allegation" had been made. When the Lubbock Diocese produced its list, entitled "Names of All Clergy with a Credible Allegation of Sexual Abuse of a Minor," it posted the list on its public website, issued a press release saying the list was issued as part of the church's effort to "protect *children* from sexual abuse," and provided an interview about the list to a Lubbock news station in which the Diocese's chancellor assured the public that the church is safe "for *children*." [Emphases added.]

Jesus Guerrero, an ordained deacon, asked the Lubbock Diocese to remove his name from the list. When the Diocese refused, Guerrero filed this suit for defamation, contending that he has never been accused—credibly or otherwise—of sexually abusing a child. The Diocese does not disagree, but it asserts that, under Catholic Canon Law, the word "minor" is defined to include

---

[6] *Id.*

[7] *Charter for the Protection of Children and Young People*, U.S. CONF. OF CATH. BISHOPS (June 2018), https://www.usccb.org/issues-and-action/child-and-youth-protection/upload/Charter-for-the-Protection-of-Children-and-Young-People-2018-final.pdf.

adults "deemed vulnerable due to a health or mental condition." According to the Diocese, Guerrero was accused—many years before the Diocese published the list—of engaging in "sexual misconduct" with an adult woman who had a history of mental and emotional illness, who "may not have been on her medications at the time of the various instances which were witnessed." The Diocese, however, did not provide its unique definition of the term "minor" when it published its list and other statements referring to abuse of "children" to the general public.

Under these circumstances, the Court's desire to protect the Diocese against anything that might inhibit its commitment to "openness" is understandable. But the rule the Court announces today—which no other court has ever announced before—is as unwise as it is unsupported by the constitutional provisions on which the Court relies. The First Amendment indisputably prohibits courts from interfering with a religious organization's internal activities and operations, including investigations and disciplinary actions involving its clergy and members. But courts throughout the country, both federal and state (including several state supreme courts) have consistently agreed that the First Amendment does not prohibit courts from hearing a defamation claim against a religious organization or official when (1) the claim is based on statements made *to the general public* and (2) the courts can resolve the claim on strictly *secular grounds*. In rejecting this holding, the Court refuses to even address this national consensus in the caselaw, much less identify any court that has ever held otherwise.

Unlike the federal Constitution, the Texas Constitution expressly guarantees not only the freedom of speech, but also that the law will hold people responsible "for the abuse of that

3

privilege."[8] Our courts must stand as the vanguard of enforcement for *both* those guarantees. However desirable the outcome of today's decision may be in this particular case, the precedential effect of the Court's holding will apply to every group that asserts a religious identity and will immunize defamatory statements publicized under far less sympathetic circumstances. And after today's decision, the First Amendment now means something different in Texas than it means throughout the rest of the country. Of course, that cannot be correct. Because I agree with all the courts around the country that have held that the First Amendment does not prohibit courts from hearing a defamation claim against a religious organization when the claim involves statements made to the general public and courts can resolve the claim on strictly secular grounds, I respectfully dissent.

## I.
### The Ecclesiastical-Abstention Doctrine

The First Amendment to the United States Constitution famously prohibits Congress from making any "law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. The Fourteenth Amendment imposes this restriction on the states. *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 441 (1969). "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). The provision prohibiting the establishment of religion means, among other things, that the government may not interfere with a religious organization's "ecclesiastical

---

[8] TEX. CONST. art. I § 8.

4

decisions." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 189 (2012).

As a result, courts may not decide "quintessentially religious controversies," *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 720 (1976), or "cases of ecclesiastical cognizance," *Watson v. Jones*, 80 U.S. 679, 729 (1871). Because secular law "knows no heresy, and is committed to the support of no dogma, the establishment of no sect," courts must abstain from hearing a claim that is "strictly and purely ecclesiastical in its character." *Id.* at 728, 733. This includes claims that require courts to evaluate and assess "the faith and mission of the church," *Hosanna-Tabor*, 565 U.S. at 190, the "centrality of particular beliefs or practices to a faith," *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989), matters of "religious law and polity," *Milivojevich*, 426 U.S. at 709, "religious doctrine and practice," *Mary Elizabeth Blue Hull*, 393 U.S. at 449, matters of "faith and doctrine," *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952), or "questions of discipline, or of faith, or ecclesiastical rule, custom, or law," *Watson*, 80 U.S. at 727.

For example, courts cannot interfere with a religious group's choices regarding its "internal governance," including its decision "to fire one of its ministers." *Hosanna-Tabor*, 565 U.S. at 181, 188. Courts cannot resolve "church property disputes on the basis of religious doctrine and practice." *Jones v. Wolf*, 443 U.S. 595, 602 (1979). They cannot hear "church disputes over church polity and church administration," or claims involving a religious organization's "internal discipline and government." *Milivojevich*, 426 U.S. at 710, 724. Nor can they decide whether a church's actions "depart substantially from prior doctrine," *Mary Elizabeth Blue Hull*, 393 U.S. at

5

450, resolve a "theological controversy," or determine the "conformity of the members of the church to the standard of morals required of them," *Watson*, 80 U.S. at 734.[9]

[9] Courts have often treated this "ecclesiastical abstention" or "religious autonomy" doctrine as a constitutional bar to the courts' jurisdiction, as the Court does in this case today. *Ante* at . In *Hosanna-Tabor*, however, the United States Supreme Court explained that the "ministerial exception" it recognized in that case operates "not [as] a jurisdictional bar" that affects the court's "power to hear [the] case," but "as an affirmative defense to an otherwise cognizable claim." 565 U.S. at 195 n.4 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010)). Nevertheless, this Court holds today that the bar remains jurisdictional, attempting to distinguish *Hosanna-Tabor* on the ground that the "ministerial exception" is "independent but related to" the ecclesiastical-abstention doctrine. *Ante* at n.1.

The Supreme Court's decisions do not support that distinction. The Supreme Court used the "ministerial exception" label in *Hosanna-Tabor* to refer to a specific type of ecclesiastical claim the First Amendment prevents courts from addressing—namely, a "minister's" claim that a religious organization for which the minister worked violated employment-discrimination statutes. *Hosanna-Tabor*, 565 U.S. at 176–77, 188. As Justice Thomas later noted, the label is actually a "misnomer" because "[t]he First Amendment's protection of religious organizations' employment decisions" sometimes extends "to the laity" as well as "to members of the clergy." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2069 n.1 (2020) (Thomas, J., concurring). In any event, the Court recognized the "ministerial exception" in *Hosanna-Tabor* both because the First Amendment's Free Exercise Clause "precludes application of [employment-discrimination statutes] to claims concerning the employment relationship between a religious institution and its ministers," and because the First Amendment's Establishment Clause "prohibits government involvement in such *ecclesiastical decisions*." *Hosanna-Tabor*, 565 U.S. at 188–89 (emphasis added). In other words, the Supreme Court's decision in *Hosanna-Tabor* was based on the same constitutional provisions and the same application of those provisions as all its other decisions applying the ecclesiastical-abstention (or religious-autonomy) doctrine.

The Supreme Court confirmed this in *Our Lady of Guadalupe*, explaining that the "constitutional foundation for [its] holding [in *Hosanna-Tabor*] was the *general principle of church autonomy* to which we have already referred: independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 140 S. Ct. at 2061 (emphasis added). It further emphasized that the precedent on which the Court relied in *Hosanna-Tabor* "drew on this broad principle, and none was exclusively concerned with the selection or supervision of clergy." *Id.* Applying this broad "understanding" of the First Amendment, the Court held that the defendants in *Our Lady of Guadalupe* qualified for the same "exemption" the Court had recognized in *Hosanna-Tabor*. *Id.* at 2066.

This Court's suggestion today that the Supreme Court in *Our Lady of Guadalupe* somehow backed off of its jurisdictional analysis in *Hosanna-Tabor*, *see ante* at ___ n.33, is simply unsupported by either of those decisions. Consistent with its holding in *Hosanna-Tabor*, the Supreme Court never mentioned "jurisdiction" in *Our Lady of Guadalupe*. Instead of dismissing the claims in that case for want of jurisdiction, it reversed the appellate courts' decisions (which themselves had reversed the district courts' summary-judgment orders) and remanded the cases to those courts for "proceedings consistent with this opinion." *Our Lady of Guadalupe*, 140 S. Ct. at 2069. In other words, it acted consistent with its holding in *Hosanna-Tabor* that the ecclesiastical-abstention doctrine is "not a jurisdictional bar," but "an affirmative defense to an otherwise cognizable claim." *Hosanna-Tabor*, 565 U.S. at 195 n.4.

This case comes to us as a petition for writ of mandamus, urging us to order the trial court to grant the Lubbock Diocese's plea to the jurisdiction. The Court grants that relief, *see ante* at , even though the Supreme Court held in *Hosanna-Tabor* and confirmed in *Our Lady of Guadalupe* that the First Amendment's prohibition against courts hearing claims involving ecclesiastical issues establishes an affirmative defense, not a jurisdictional bar. For this additional reason, I cannot join the Court's opinion or disposition in this case.

But the First Amendment's bar against courts hearing ecclesiastical disputes is not without its limits. Just as the Free Exercise Clause does not excuse religiously motivated citizens from "compliance with an otherwise valid law prohibiting conduct that the State is free to regulate," *Smith*, 494 U.S. at 879, the Establishment Clause does not prevent courts from deciding disputes involving religious organizations by applying "neutral principles of law," *Jones*, 443 U.S. at 604; *Mary Elizabeth Blue Hull*, 393 U.S. at 449.

## II.
## Texas Precedent

This Court has addressed and applied the ecclesiastical-abstention doctrine in a handful of cases. Initially, we held in a pair of decisions that the First Amendment prevented the courts from hearing tort claims against a religious organization when the resolution of the claims would require the courts to interfere with internal religious requirements and conduct. In *Westbrook v. Penley*, 231 S.W.3d 389 (Tex. 2007), a former church member sued the church's pastor for negligence, breach of fiduciary duty, and intentional infliction of emotional distress[10] after the pastor disclosed the member's confession of an extra-marital affair to the church's elders, who—with the pastor's aid—reported the affair in a letter to the church's members[11] and called on the members to "break fellowship" with her. *Id.* at 393–94. The former member argued that because the pastor was also a state-licensed professional counselor and she disclosed the affair to him during a "secular" counseling session, the courts could hear and decide her claims based on neutral principles without

---

[10] The former member "originally asserted but later abandoned" a claim for defamation. *Westbrook*, 231 S.W.3d at 396.

[11] This "letter admonished the congregation to treat the matter as a 'members-only issue, *not to be shared with those outside [the congregation].*'" *Id.* at 393 (emphasis added).

deciding ecclesiastical issues. *Id.* at 396, 399. We disagreed, holding that even assuming the counseling session was "purely secular in nature," the pastor's state-imposed duty of confidentiality conflicted with his church-imposed duty to disclose her conduct to the elders and other church members. *Id.* at 392. Although we agreed "that the First Amendment does not necessarily bar all claims that may touch upon religious conduct," *id.* at 396, we concluded that "parsing" the pastor's conflicting roles and duties "would unconstitutionally entangle the court in matters of church governance and impinge on the core religious function of church discipline," *id.* at 391–92.

The following year, we held in *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1 (Tex. 2008), that the courts could not hear a teenage church member's claims that the church had forcibly restrained her while "laying hands" on her and praying over her during a "spiritually charged" youth-group gathering. *Id.* at 3, 8. The teenager and her parents sued the church, its pastors, and some members, seeking damages for "mental, emotional and psychological" injuries. *Id.* at 5.[12] We held that the claims were not cognizable because, "[a]lthough the Free Exercise Clause does not categorically insulate religious conduct from judicial scrutiny, it prohibits courts from deciding issues of religious doctrine." *Id.* at 11. Because the resolution of the claims would require inquiry into "church beliefs on demonic possession," we concluded that "the imposition of tort liability for engaging in religious activity to which the church members adhere would have an

---

[12] The plaintiffs asserted claims for negligence, gross negligence, professional negligence, intentional infliction of emotional distress, false imprisonment, assault, battery, loss of consortium, and child abuse. 264 S.W.3d at 5.

unconstitutional 'chilling effect' by compelling the church to abandon core principles of its religious beliefs." *Id.* at 10–11.

More recently, we held in a pair of cases that the First Amendment does not prevent courts from hearing and resolving disputes over ownership of church property when they can resolve those disputes based on "neutral principles of law." In *Masterson v. Diocese of Northwest Texas*, 422 S.W.3d 594 (Tex. 2013), we adopted the "neutral principles" standard for resolving church-property disputes because that standard best balances the courts' "constitutional duty to decide disputes within their jurisdiction while still respecting" the First Amendment's limitations. *Id.* at 596. We acknowledged that courts cannot "decide questions of an ecclesiastical or inherently religious nature, so as to those questions they must defer to decisions of appropriate ecclesiastical decision makers." *Id.* at 605–06. But because courts are "[duty-]bound to exercise jurisdiction vested in them by the Texas Constitution and cannot delegate their judicial prerogative where jurisdiction exists," we held that courts must "apply neutral principles of law to non-ecclesiastical issues involving religious entities in the same manner as they apply those principles to other entities and issues." *Id.* at 606.

Applying *Masterson*, we held most recently that the ecclesiastical-abstention doctrine did not prohibit courts from deciding whether the Episcopal Diocese of Fort Worth or the national Episcopal Church from which the Diocese had split owned church property within the Fort Worth area. *Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417, 420 (Tex. 2020), *cert. denied sub nom. All Saints' Episcopal Church (Fort Worth) v. Episcopal Diocese of Fort Worth*, No. 20-534, 2021 WL 666391 (U.S. Feb. 22, 2021), *and cert. denied*, No. 20-536,

2021 WL 666393 (U.S. Feb. 22, 2021). While acknowledging that courts cannot make "ecclesiastical determinations" or "resolve disputes turning on tenets of faith," and thus could not decide "which faction is the true diocese loyal to the church and which congregants are in good standing," *id.* at 432–33, 435, we concluded that courts could resolve the property-ownership issue because, by "applying neutral principles to the organizational documents, the question of property ownership is not entwined with or settled by [ecclesiastical] determinations." *Id.* at 433.

## III.
## Defamation Claims

Neither this Court nor the United States Supreme Court has addressed whether or when the ecclesiastical-abstention doctrine applies to defamation claims. *See Hosanna-Tabor*, 565 U.S. at 196 (expressing "no view on whether" the doctrine bars actions alleging "tortious conduct by . . . religious employers"). Many other courts have, however, and they have consistently agreed that the doctrine does not bar defamation claims that (1) are based on statements made to the general public, outside the religious organization itself, and (2) can be resolved by applying neutral principles, even when the statements were published by a church, its clergy, or another member of a religious organization.

### A.     Statements made to the general public

When deciding that the First Amendment bars courts from hearing a defamation claim against a religious organization, numerous courts—including two state supreme courts—specifically reasoned that the bar applied because the statements were made only internally, solely to the organization's leaders or members. In *Hiles v. Episcopal Diocese of Massachusetts*, 773 N.E.2d 929 (Mass. 2002), for example, the Supreme Judicial Court of Massachusetts held that an

10

Episcopalian priest could not sue a parishioner for defamation based on a letter the parishioner sent to the church's bishop, in which she confessed to having an extended sexual relationship with the priest, in part because the letter "was published solely in a canonical context" and used solely "to invoke the Church's internal disciplinary procedures." *Id.* at 936. The court specifically noted that its analysis was "predicated on the fact that the only defamatory publication allegedly made by [the parishioner] was made to the Church itself, within its internal disciplinary procedure," and it explained that the "absolute First Amendment protection for statements made by a Church member in an internal church disciplinary proceeding would *not* apply to statements made or repeated outside that context." *Id.* at 937 n.12 (emphasis added).

Similarly, in *Pfeil v. St. Matthews Evangelical Lutheran Church of the Unaltered Augsburg Confession of Worthington*, 877 N.W.2d 528 (Minn. 2016), the Minnesota Supreme Court dismissed two excommunicated parishioners' defamation suit against their former church and pastors because "[a]ll of the statements on which the [parishioners] base their claims occurred during church disciplinary proceedings, and [the First Amendment] prohibits civil courts from inquiring into any statements made during the course of a church disciplinary proceeding." *Id.* at 536. Like the Massachusetts court in *Hiles*, the Minnesota court specifically noted that it would "be troubled . . . if the statements were disseminated to individuals *outside* of the religious organization." *Id.* at 540 (emphasis added). But because the ministers "only disseminated those statements to members of the congregation," the court held that the First Amendment barred the defamation claim. *Id.* at 541.

11

Numerous other courts, including our own state's courts of appeals, have also expressly noted, when holding that the ecclesiastical-abstention doctrine barred a defamation claim, that the alleged defamatory statements were published only to members of the religious organization as part of the organization's internal investigatory or disciplinary process. *See, e.g.*, *Yaggie v. Ind.-Ky. Synod, Evangical Lutheran Church in Am.*, 64 F.3d 664 (6th Cir. 1995) (per curiam) (unpublished table decision) (noting that "the alleged defamatory statements were made in connection with the mediation process and strictly within the confines of the church"); *Hubbard v. J Message Grp. Corp.*, 325 F. Supp. 3d 1198, 1219 (D.N.M. 2018) (mem. op.) ("[T]o the extent that the allegations in the Complaint suggest that the allegedly defamatory statements were published exclusively to the [religious organization's] membership, this fact strengthens the Court's conclusion that Plaintiff's claims, having occurred in the context of an ecclesiastical dispute with [the religious organization], are barred by the First Amendment."); *Jennison v. Prasifka*, 391 S.W.3d 660, 667–68 (Tex. App.—Dallas 2013, no pet.) (noting that the "only defamatory statements allegedly made by [the defendant] were made to the church itself in connection with the church's disciplinary process," and plaintiff made "no allegation the allegedly defamatory statements were made in any other forum"); *Stepek v. Doe*, 910 N.E.2d 655, 667 (Ill. App. Ct. 2009) (noting that defamation claim was based on statements that "were published solely within the Catholic Church's internal disciplinary proceedings"); *Patton v. Jones*, 212 S.W.3d 541, 555 (Tex. App.—Austin 2006, pet. denied) (holding First Amendment barred minister's defamation claim in part because "the alleged 'publication' [was] confined within the church"); *Heard v. Johnson*, 810 A.2d 871, 885 (D.C. 2002) (holding ecclesiastical-abstention

12

doctrine "extend[s] to defamation claims, when: (1) such a claim flows entirely from an employment dispute between a church and its pastor so that consideration of the claim in isolation from the church's decision as to the pastor is not practical, (2) *the alleged 'publication' is confined within the church*, and (3) there are no unusual or egregious circumstances") (emphasis added); *Schoenhals v. Mains*, 504 N.W.2d 233, 236 (Minn. Ct. App. 1993) ("[W]e believe that the fact that the letter was disseminated only to other members of the Church strengthens the conclusion that Mains' statements involved and were limited to Church discipline.").

Under this same reasoning, however, numerous other courts have held that the First Amendment does *not* prohibit courts from hearing a defamation claim based on statements communicated beyond the religious organization to members of the public. In *Kliebenstein v. Iowa Conference of United Methodist Church*, 663 N.W.2d 404 (Iowa 2003), for example, the Iowa Supreme Court held that the First Amendment did not bar a church member's defamation claim based on a letter that was "mailed not only to members of the congregation but also to other persons living in the Shell Rock community." *Id.* at 405. The court observed that courts could not hear the claim "had the matter been divulged solely to the members of" the church, but "if publication solely to church members justifies ecclesiastical status for otherwise defamatory communications, proof of publication to *non*-church members arguably supports the opposite conclusion." *Id.* at 406–07.

Similarly, in *Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877 (Tex. App.—Dallas 2000, pet. denied), a decision this Court declined to review, the Dallas Court of Appeals held that the First Amendment did not bar a church member's defamation claim arising

13

from the church's disclosure of information regarding his mental condition outside the church, including to his grandparents. *Id.* at 896. The court explained that the church's external disclosure of the information did not concern "internal policies of the Church or matters of faith or ecclesiastical doctrine," and the court's resolution of the claim based on that external disclosure would not "actively involve the government in the Church's religious activities or excessively entangle the government with religion." *Id.*

And in *Lipscombe v. Crudup*, 888 A.2d 1171 (D.C. 2005), the D.C. court of appeals held that the First Amendment did not bar a church member's defamation claim against the church's pastor, in part because the member's allegation "that the statement was made 'to the public in an open meeting' sufficiently alleged that others besides church members were present," and his affidavit "asserted explicitly that '[t]he public gathering was not part of any church service and members from the public, including accountants, heard the Statement." *Id.* at 1173 & n.2.

Numerous other courts, including Texas courts of appeals, have adopted this same reasoning. *See, e.g.*, *Hadnot v. Shaw*, 826 P.2d 978, 985 (Okla. 1992) (noting that statements contained in letter were not defamatory, even assuming "the lay leader communicated the letters' contents outside the Church"); *Kelly v. St. Luke Cmty. United Methodist Church*, No. 05-16-01171-CV, 2018 WL 654907, at *1 (Tex. App.—Dallas, Feb. 1, 2018, pet. denied) (mem. op.) (holding ecclesiastical-abstention doctrine did not bar defamation claim "respecting statements allegedly published to persons outside the church"); *Ausley v. Shaw*, 193 S.W.3d 892, 896 (Tenn. Ct. App. 2005) (holding First Amendment did not bar minister's slander claim because statements "were

made in the presence of Church members, local law enforcement, and members of the surrounding community").

Here, Guerrero alleges—and the Lubbock Diocese does not dispute—that the Diocese publicized the list that included his name among those credibly accused of sexually abusing "minors" (along with statements referring to the safety of "children") not merely to and within the church, but to the general public through the church's website, a press release, and an interview with local media. By choosing to broadcast the statements beyond the church and involve the general public in the church's disciplinary procedures, the Diocese altered the nature of the constitutional concerns. *See, e.g.*, *Pleasant Glade Assembly of God*, 264 S.W.3d at 12 (noting that "religious practices that might offend the rights or sensibilities of a non-believer outside the church are entitled to greater latitude when applied to an adherent within the church"). At that point, the church's conduct was no longer "strictly and purely ecclesiastical in its character," *Watson,* 80 U.S. at 733, and Guerrero's complaint became more than a "quintessentially religious controvers[y]" involving only the church's "*internal* discipline and government," *Milivojevich*, 426 U.S. at 720, 724 (emphasis added).

The Diocese's assertion that its religious teachings required it to publicly disclose the list in compliance with Pope Francis's commitment to "openness" does not alter this conclusion. Nor does the Court's assertion that Guerrero's claim is "inextricably intertwined" with the church's directive that the Diocese internally investigate its clergy. *Ante* at __. The Court asserts that the church's decision to publish a list of those credibly accused of abusing minors cannot be severed from its decision to investigate its clergy, *ante* at __, but Guerrero's defamation claim does not

15

complain about—and a jury would not be required to evaluate—either of those actions. The Diocese investigated allegations against Guerrero years before the church published the list, and Guerrero has never complained about the church's decision to conduct that investigation. Guerrero's defamation claim does not challenge that investigation or the Diocese's decision to publicize the list; he complains of the Diocese's inclusion of his name on the list, which he asserts falsely defames him by communicating to the public that he had been credibly accused of sexually abusing a "minor."

The Diocese's—indeed, the entire church's—commitment to public transparency as it seeks to leave its "atrocities" behind is both understandable and laudable. But the issue here is not whether the Diocese should have investigated Guerrero, internally disciplined him, or even published a list of those who had been accused of sexual misconduct. Nor does Guerrero complain that the Diocese concluded *internally* that he had been accused of sexually abusing a "minor," as Canon Law defines that term. His complaint is that the Diocese should not have broadcast to the general public an allegation that he had been credibly accused of sexually abusing a "minor."

Exercising jurisdiction over Guerrero's claim would not second-guess or threaten the church's (or any other religious organization's) decision to investigate its clergy, finding of misconduct by a clergy member, or imposition of internal disciplinary measures against a member within the church's religious activities. What it would threaten is a religious organization's ability to make false and defamatory statements about its clergy or members to the general public, outside of the organization's internal operations. The issue here is simply whether the First Amendment prohibits courts from hearing a claim that the information distributed to the general public in and

16

with the Diocese's list falsely defamed Guerrero. Like all the other courts around the country, I conclude it does not. "It is one thing to say that churches must be free of governmental interference to conduct matters of *internal discipline and organization*, even when those matters touch upon the reputations of those effected." *Hayden v. Schulte*, 701 So. 2d 1354, 1356–57 (La. Ct. App. 1997) (emphasis added). But it is "quite another to say that churches have the unfettered right to make unsubstantiated statements of an essentially secular nature to the media destructive of a priest's character." *Id.* at 1357. By extending its internal disciplinary procedures and beliefs into the public arena, the Diocese subjected itself to the public laws that govern that realm.[13]

---

[13] The Court suggests in passing that the First Amendment bars this suit because the Free Exercise Clause permits a religious organization to "engage freely in ecclesiastical discussions with more than just its members." *Ante* at ___ (citing *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 (10th Cir. 2002)). According to the Court, a religious organization's decision to "enter the public square" does not "revoke ecclesiastical protection." *Ante* at ___ (quoting *Whole Woman's Health v. Smith*, 896 F.3d 362, 372 (5th Cir. 2018)). This argument misrepresents the decisions in both those cases. In *Bryce*, a minister and her same-sex partner alleged that the minister's church's leaders and members made "sexually harassing remarks" in letters between the senior minister and "other church leaders" and "at a series of church meetings." 289 F.3d at 657. Applying the ecclesiastical-abstention doctrine, the court held that the First Amendment barred the minister's and her partner's claims because the letters "discussed an internal church personnel matter and the doctrinal reasons for [the] proposed personnel decision," and the church meetings "facilitated religious communication and religious dialogue between [the senior] minister and his parishioners." *Id.* at 658. In stating that the church could "engage freely in ecclesiastical discussions with members and non-members," the court was specifically referring to the fact that the minister's partner, who was not a member of the church, was present at the meetings. *Id.* The court concluded that the First Amendment also barred her claims because she "voluntarily attended" the meetings and "voluntarily became part of [the church's] internal dialogue on homosexuality and [the minister's] employment." *Id.* *Bryce* did not involve a church's broadcast of allegedly defamatory statements to the general public or to "non-members" who had not voluntarily chosen to participate in a church's *internal* doctrinal discussions.

In *Whole Woman's Health*, the plaintiff, who sued to challenge a state statute and regulations that imposed restrictions on the disposal of fetal remains, sought through a third-party discovery subpoena to force the Texas Conference of Catholic Bishops (a non-party) to disclose its *internal* communications regarding public testimony it provided in support of the restrictions. 896 F.3d at 365–66. The court quashed the subpoena, holding that by "engag[ing] in activity in the public square," the Conference did not forfeit the First Amendment's protection of the Conference's "inner workings" and "internal communications." *Id.* at 372. The court relied not on the First Amendment's religion clauses or the ecclesiastical-abstention doctrine, but on the clause that protects the "freedom to associate," which protects the internal deliberations not just of religious organizations but of "citizens' groups" and all other organizations that participate in the public square. *Id.* Neither *Bryce* nor *Whole Woman's Health* held—or even discussed whether—a religious organization's right to engage in the public arena gives it the right to falsely defame others within that arena. *See id*.

**B.     Neutral principles**

In addition to barring court intrusions into a church's "internal" operations and proceedings, the First Amendment precludes judicial inquiries into a religious organization's "particular beliefs," *Hernandez*, 490 U.S. at 699, matters of "religious law," *Milivojevich*, 426 U.S. at 709, and issues of "religious doctrine," *Mary Elizabeth Blue Hull*, 393 U.S. at 449. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires," *Smith*, 494 U.S. at 877, and courts have no business evaluating the soundness of a church's doctrinal teaching or whether one has conformed to or strayed from those teachings, *Mary Elizabeth Blue Hull*, 393 U.S. at 450; *Watson*, 80 U.S. at 733–34.

Because of this, courts have held that the First Amendment bars a defamation claim when a statement's defamatory nature or its truth or falsity depends upon the interpretation and application of religious doctrine and teachings. In *O'Connor v. Diocese of Honolulu*, 885 P.2d 361 (Haw. 1994), for example, a member of the Catholic Church who published a newspaper that was critical of the local Diocese and Bishop sued them both after the church excommunicated him, asserting that they defamed him by publicizing allegations that he had committed "'criminal penal ecclesiastical' violations," created a "schism," misrepresented the Catholic faith "against the warnings of the Holy See," was a "fanatic[]" who "came from a neolithic mind frame," was disloyal to the Pope, and had "caused others to suffer the loss of their immortal souls." *Id.* at 367–68. The Hawaii Supreme Court held that the First Amendment barred courts from hearing these claims because, "to determine the truth or falsity of the statements, a state court would have to

inquire into church teachings and doctrine" and determine "doctrinal correctness" by "analyzing church law." *Id.* at 368.

Other courts have reached the same conclusion when faced with similar circumstances that required them to evaluate religious and doctrinal issues to resolve a defamation claim. *See, e.g.*, *Pfeil*, 877 N.W.2d at 538 (observing that statements "cannot serve as the basis for a defamation claim" when "adjudicating the truth or falsity of the statements would require the court to consider and interpret matters of church doctrine"); *Howard v. Covenant Apostolic Church, Inc.*, 705 N.E.2d 385, 389 (Ohio Ct. App. 1997) (holding First Amendment barred defamation claim when its resolution would require "biblical interpretation" and a determination of plaintiff's "'conformity . . . to the standard of morals required of' him by his church," matters that are "inextricably intertwined with ecclesiastical or religious issues over which secular courts have no jurisdiction"); *Schoenhals*, 504 N.W.2d at 236 ("Since examination of the truth of [the defendants]' statements would require an impermissible inquiry into Church doctrine and discipline, the district court did not err in concluding that the defamation claim is precluded by the First Amendment.").

But as numerous courts—including at least six other state supreme courts—have recognized, the First Amendment does not bar a defamation claim, even if it arises from a religious context, when courts can resolve the claim by applying only non-religious, neutral principles. In *Kliebenstein*, for example, the Iowa Supreme Court held that the plaintiff could pursue her claim that a church defamed her by publicizing an accusation that she had the "spirit of Satan," because the phrase "spirit of Satan" has "a secular, as well as sectarian, meaning." 663 N.W.2d at 405, 408.

Because the phrase has a secular meaning that a jury could evaluate "without resort to theological reflection," the court concluded that the ecclesiastical-abstention doctrine did not apply. *Id.* at 405, 407.

Similarly, in *Bowie v. Murphy*, 624 S.E.2d 74 (Va. 2006), the Virginia Supreme Court held that the First Amendment did not bar a church deacon's claim that the church's minister and other members defamed him by publicizing statements that he had "assaulted" another member. *Id.* at 76–77, 79–80. The court reasoned that although courts could not consider claims challenging the church's decisions involving its internal governance, they could evaluate the defendants' "statements for their veracity and the impact they had on [the deacon's] reputation the same as if the statements were made in any other, non-religious context." *Id.* at 79.

And in *Banks v. St. Matthew Baptist Church*, 750 S.E.2d 605 (S.C. 2013), the South Carolina Supreme Court held that the First Amendment did not bar defamation claims asserted by a church's trustees against the church's pastor, who allegedly accused the trustees of mismanaging (and, impliedly, stealing) the church's property and of lying to the pastor about their conduct. *Id.* at 606–07. The court reasoned that the bar would apply if, for example, the pastor had accused the trustees of being "sinners," of being "not true followers of God," or of violating church law. *Id.* at 608. But because courts could determine whether the pastor actually made the statements and whether they harmed the trustees by applying "neutral principles," without requiring "any inquiry into or resolution of religious law, principle, doctrine, discipline, custom, or administration," the court held that the First Amendment did not bar the claim. *Id.* at 607–08.

Numerous other courts have consistently agreed with this reasoning. *See, e.g.*, *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 349 (5th Cir. 2020) (holding First Amendment did not bar defamation claim brought by executive director of church's local mission board against church's national mission board, based on alleged statements accusing director of refusing to meet with national board's president, because resolution of claim would not "require the court to address purely ecclesiastical questions"); *Drevlow v. Lutheran Church*, 991 F.2d 468, 471–72 (8th Cir. 1993) (holding First Amendment did not bar minister's libel claim against church based on false statements church allegedly made about minister's wife, because resolution of claim would not "definitely involve the district court in an impermissible inquiry into the Synod's bylaws or religious beliefs"); *Tubra v. Cooke*, 225 P.3d 862, 864 (Or. 2010) (holding First Amendment did not bar pastor's defamation claim based on church leaders' statements that minister "had misappropriated church funds and was dishonest during his time as pastor"); *Connor v. Archdiocese of Phila.*, 975 A.2d 1084, 1107 (Pa. 2009) (holding First Amendment did not bar parents' defamation claim based on parochial school's alleged statements that child "brought a weapon to school" because "this is not a case in which religious authority would be directly relevant to a party's showing on the merits of his or her opponent's claims"); *Lipscombe*, 888 A.2d at 1173–74 (holding First Amendment did not bar defamation claim because resolution did not require "inquiry by the court into church religious practices or financial management"); *McAdoo v. Diaz*, 884 P.2d 1385, 1390–91 (Alaska 1994) (holding First Amendment did not bar church volunteer's defamation claim against pastor because "a determination of whether the statements were true and the amount of damage to [the volunteer's] reputation does not present a

religious question"); *Marshall v. Munro*, 845 P.2d 424, 425, 428 (Alaska 1993) (holding First Amendment did not bar pastor's defamation claim against executive presbyter who told other churches that pastor "was divorced, was dishonest, was unable to perform pastoral duties due to throat surgery, and had made an improper advance to a [church] member," because courts need "only determine if the facts stated were true and if [the presbyter] made the statements with malice," without deciding whether the pastor was qualified to serve).

Here, the Court asserts that the First Amendment bars Guerrero's defamation claim because the resolution of that claim "will necessarily require the trial court to evaluate whether the Diocese properly applied Canon Law." *Ante* at __. Specifically, the Court suggests that resolution of Guerrero's claim will require courts to perform a "secular investigation into the Diocese's understanding of the term 'minor,' whether the court agrees that the woman he allegedly sexually abused qualifies as a 'minor' under Canon Law, and whether the allegations which the church possesses were sufficiently 'credible.'" *Ante* at __.

To be sure, the First Amendment bars courts from second-guessing a church's internal decisions regarding the meaning of words it uses in its internal doctrinal statements. The Catholic Church has painstakingly struggled with the "concept of 'minor,'" which "has varied over the course of time." *Vademecum on Certain Points of Procedure in Treating Cases of Sexual Abuse of Minors Committed by Clerics*, THE HOLY SEE (July 16, 2020), http://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_2020071 6_vademecum-casi-abuso_en.html. Initially, the church defined the term to include only persons under sixteen years of age, but it expanded the definition in 2001 to include those under eighteen.

22

*Id.* In 2010, the church announced that any "person who habitually has the imperfect use of reason is to be considered equivalent to a minor." *Id.* But this is to be distinguished from a "vulnerable adult," described as "any person in a state of infirmity, physical or mental deficiency, or deprivation of personal liberty which, in fact, even occasionally limits their ability to understand or to want or otherwise resist the offence," who, apparently, in some (but not all) circumstances, also qualifies as a "minor" under the church's laws. *Id.* In 2019, however, Pope Francis referred alternatively to "a minor *or* a vulnerable person," providing different definitions for each term. *Apostolic Letter Issued Motu Proprio by the Supreme Pontiff Francis "Vos Estis Lux Mundi,"* THE HOLY SEE (May 7, 2019), http://www.vatican.va/content/francesco/en/motu_proprio/documents/papa-francesco-motu-proprio-20190507_vos-estis-lux-mundi.html (emphasis added). And just this month, the church revised (for the first time in over forty years) the penal provisions of the church's Code of Canon Law, which now refer in the alternative to "a minor *or* a person who habitually has an imperfect use of reason *or* one to whom the law recognises equal protection." 2021 CODE c.1398, § 1 (emphases added), https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2021/06/01/210601b.html.

But to resolve Guerrero's defamation claim against the Lubbock Diocese, courts need not struggle through the church's internal doctrinal definitions of the term "minor." To recover on his claim, Guerrero must only establish that the Diocese published a factual statement about him that was both defamatory and false, and that it did so "with the requisite degree of fault." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018). Under neutral principles of Texas law, a

23

publication is false—or not "substantially true" and thus actionable—if it "is more damaging to the plaintiff's reputation than a truthful broadcast would have been." *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013). And a publication is defamatory (or libelous) if it "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Id.* at 60 (quoting TEX. CIV. PRAC. & REM. CODE § 73.001).

Importantly, courts must make these determinations based not on the speaker's intended meaning of the words it published, but "upon how a person of ordinary intelligence would perceive" the statement, in light of all the surrounding circumstances. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000). The statement's meaning, in other words, "and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication," not on what the Diocese may have intended when it used the word "minor." *Id.* at 115. To prevail, Guerrero must prove not what the Diocese meant when it publicly stated that Guerrero had been credibly accused of sexually abusing a "minor," but what the public would have understood that statement to mean, given all the circumstances. Noting that the Diocese's public statements regarding the list it publicized referred to the safety of "children," Guerrero alleges that the public would have understood that Guerrero had been credibly accused of sexually abusing a child.

Applying these neutral principles of Texas law "obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine." *Jones*, 443 U.S. at 605. Indeed, the Catholic Church has itself agreed that its norms governing the reporting of suspected sexual abuse by clergy

24

should "apply without prejudice to the rights and obligations established in each place by state laws." *Apostolic Letter Issued Motu Proprio by the Supreme Pontiff Francis "Vos Estis Lux Mundi,"* THE HOLY SEE (May 7, 2019), http://www.vatican.va/content/francesco/en/motu_proprio/documents/papa-francesco-motu-proprio-20190507_vos-estis-lux-mundi.html. Courts need not delve into ecclesiastical issues to decide whether the Diocese's statement that "credible allegations" had been made that Guerrero sexually abused a "minor" was false and defamatory. Those determinations involve purely secular issues to be resolved by applying neutral principles of law.

When the Oregon Supreme Court concluded that the First Amendment did not bar a defamation claim based on statements accusing a minister of theft and misappropriation, it observed that such a claim was no "more (or less)" an ecclesiastical matter than a claim "accusing a pastor of child molestation." *Tubra*, 225 P.3d at 872. No matter how pure their intent, religious organizations cannot immunize themselves from court inquiries regarding such important societal concerns merely by incorporating those concerns into their religious doctrine. As a Louisiana court explained:

> Society does not view child molestation as a matter of religious doctrine, as distinguished from, say, the procedures within the Church necessary to atone for such a sin. Child sexual abuse is anathema to society in general, even to atheists. It is prohibited by secular laws. The public has an interest in matters of child molestation. Therefore, where child molestation is at issue, it cannot be considered just an internal matter of Church discipline or administration. Child molestation is distinguishable from those cases where religious figures claim that their reputations were damaged because they were found to be poor administrators or where their private conduct did not comport with church standards, but the issue was not one of the violation of secular criminal laws.

25

> *The Church cannot appropriate a matter with secular criminal implications by making it simultaneously a matter of internal Church policy and discipline.*

*Hayden*, 701 So. 2d at 1356 (emphasis added).

## IV.
## Conclusion

The Court need not and does not decide today whether the Catholic Church has responded adequately or appropriately to the "culture of abuse" that existed within its midst. Nor need we decide whether the Lubbock Diocese should be held liable to Guerrero for defamation. Our views on those issues are irrelevant to the only issue before us: whether the First Amendment prohibits Texas courts from hearing Guerrero's claim. If it does, we must dismiss the claim and leave Guerrero and the Diocese to their mutual pursuit of righteousness and fellowship within the tenets of their shared faith.[14] But if it does not, we are as duty-bound to hear and resolve Guerrero's claim as we would be to refrain from hearing it if the First Amendment did apply. *See Masterson*, 422 S.W.3d at 606. Because Guerrero's defamation claim is based on statements the Lubbock Diocese published beyond the church to the general public, and because courts can resolve that claim based on neutral principles without becoming entangled in ecclesiastical issues, I agree with all the federal and state courts around the country, which have consistently held that the First Amendment does not bar the courts from hearing such a claim. Because the Court holds otherwise, I respectfully dissent.

---

[14] Some might contend that those shared tenets compel both parties to resolve their dispute without the courts' involvement regardless of whether the First Amendment bars Guerrero's claim. *See 1 Corinthians* 6:7 ("Why not rather be wronged?"). But that ecclesiastical issue is not for this Court to decide.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 11, 2021