Jane KLIEBENSTEIN and Glen
Kliebenstein, Appellants,

v.

IOWA CONFERENCE OF the UNITED
METHODIST CHURCH, the United
Methodist Church of Shell Rock,
Iowa, Jerrold W. Swinton, Rick Krom-
minga, Karen Wahl, Kay J. Lahr and
Karen L. Peterson, Appellees.

No. 02–0011.

Supreme Court of Iowa.

June 11, 2003.

---

Thomas C. Verhulst of Gallagher, Langlas & Gallagher, P.C., Waterloo, for appellants.

L.R. Voigts and Jodi L. Ahlman of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellees.

NEUMAN, Justice.

This appeal involves a church-related controversy, an area of discord traditionally considered "off limits" for civil courts. Plaintiff, Jane Kliebenstein, claims she can overcome that jurisdictional hurdle here because church officials' allegedly defamatory statements about her carried secular overtones and were published to non-members of the church. We agree that she has an actionable, albeit limited, claim that cannot be resolved by way of summary judgment. We therefore reverse the district court's dismissal and remand for further proceedings.

## I. Background Facts and Proceedings.

The controlling facts are not disputed. In March 1999, Jane Kliebenstein and her husband, Glen, were members of Shell Rock United Methodist Church (UMC). Defendant Jerrold Swinton was the UMC district superintendent. Prompted by reports of strife within the congregation, Swinton (who is an ordained minister) visited the Shell Rock church one Sunday morning. He then wrote the letter that is at the heart of this controversy.

Swinton's letter, which was also signed by the members of the Staff Parish Committee, was mailed not only to members of the congregation but also to other persons living in the Shell Rock community. Portions of the letter pertinent to these proceedings are quoted below:

> A few months ago I attended worship in Shell Rock and I rejoiced to see so many young families in church. I was in despair when Jane Kliebenstein made an effort to whisper scornfully to me that this pastor must leave Shell Rock. . . .
>
> . . . .
>
> Folks, when is enough, enough? When will you stop the blaming, negative and unhappy persons among you from tearing down the spirit of Jesus Christ among you? ... You know whether a person has the spirit of Jesus or Satan by their fruits. . . . I am distressed and perplexed why people have tolerance and compassion for anyone who habitually tears down the Body of Christ by habitually sowing discord and pain.
>
> . . . .
>
> When the congregation of Shell Rock is ready to acknowledge they allowed the spirit of Satan to work in their midst, express some contrition and seek help—then help will come. . . .

Swinton's letter went on to advise that he and the Staff Parish Committee would call a "Church Conference" in accordance with established disciplinary procedures to "propose that Jane Kliebenstein be stripped of church offices. It is understood that if she continues to cause dissension, she will next be asked to leave the Shell Rock UMC."

The Kliebensteins responded with this suit for defamation. Their petition claimed the letter falsely attacked Jane's "integrity and moral character," causing

damage to her reputation in the community. Glen sought damages for loss of consortium.

Following discovery, defendants moved for summary judgment. They conceded for purposes of the motion that Swinton's statement about the "spirit of Satan" referred to Jane Kliebenstein. They argued, however, that the phrase is a "purely ecclesiastical term, deriving its meaning from religious dogma" thereby preventing the court from adjudicating its impact in the context of a civil suit for defamation. The district court agreed, finding it was constitutionally without jurisdiction to entertain the controversy. This appeal by the Kliebensteins followed.

## II. Issue on Appeal/Scope of Review.

Plaintiffs concede that the Free Exercise and Establishment Clauses of our federal and state constitutions preclude civil court interference in the disciplinary and governance matters of a religious entity. They urge this court to find, however, that the defendants "exceeded the protective confines of these clauses when they published their humiliating and disparaging remarks to individuals in the local community who were not members of the church nor allowed to participate in the disciplinary proceedings" brought against Jane. Defendants counter that adjudication of plaintiffs' claims would necessarily entangle the court in church doctrine, a matter clearly beyond its jurisdiction.

■ As this case reaches us on appeal from summary judgment proceedings, we are obliged to view the facts in the light most favorable to the parties resisting the motion, the plaintiffs. *Marks v. Estate of Hartgerink,* 528 N.W.2d 539, 544 (Iowa 1995). Summary judgment is appropriately granted only where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.

*Behr v. Meredith Corp.,* 414 N.W.2d 339, 341 (Iowa 1987).

## III. Analysis.

■ By its very nature, the controversy before us implicates the Establishment Clauses of the federal and Iowa constitutions. Iowa, like virtually every other jurisdiction, avoids "interfering in *purely* ecclesiastical matters." *Marks,* 528 N.W.2d at 544 (emphasis added).

It is a general rule recognized here and in foreign jurisdictions, that ordinarily the courts have no jurisdiction over, and no concern with, purely ecclesiastical questions and controversies, including membership in a church organization, but they do have jurisdiction as to civil, contract, and property rights which are involved in or arise from a church controversy.

*Brown v. Mt. Olive Baptist Church,* 255 Iowa 857, 859, 124 N.W.2d 445, 446 (1963).

■ Plainly Iowa's courts could not entertain this case if it involved solely the discipline or excommunication of Jane Kliebenstein. *Marks,* 528 N.W.2d at 545. "[C]ivil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151, 165 (1976); *accord Drevlow v. Lutheran Church, Missouri Synod,* 991 F.2d 468, 471 (8th Cir.1993). Nor would her claim enjoy viability had the matter been divulged solely to the members of Shell Rock UMC. It is the general rule that

the common interest of members of religious associations is such as to afford the protection of qualified privilege to communications between them in fur-

therance of their common purpose or interest. Thus, communications between members of a religious organization concerning the conduct of other members or officers in their capacity as such are qualifiedly privileged.

50 Am.Jur.2d *Libel and Slander* § 340, at 663 (1995); *see Marks,* 528 N.W.2d at 546 (applying qualified privilege to statements made in context of church disciplinary proceedings).

■ The fact that Swinton's communication about Jane was published outside the congregation weakens this ecclesiastical shield. First, otherwise privileged communications may be lost upon proof of excess publication or publication "beyond the group interest." *Brewer v. Second Baptist Church of Los Angeles,* 32 Cal.2d 791, 197 P.2d 713, 717 (1948) (citation omitted); *accord Marks,* 528 N.W.2d at 546. Second, if publication solely to church members justifies ecclesiastical status for otherwise defamatory communications, proof of publication to *non*-church members arguably supports the opposite conclusion. *See Schoenhals v. Mains,* 504 N.W.2d 233, 236 (Minn.Ct.App.1993) (proof that alleged defamatory letter sent only to church members strengthened First Amendment claim precluding adjudication of "internal conflict within the Church").

Defendants counter that publication to *non*-church members is irrelevant here. Their defense rests on the general rule that "[d]efamation actions are precluded by the First Amendment when an examination of the truth of the allegedly defamatory statements would require an impermissible inquiry into church doctrine and discipline." 50 Am.Jur.2d *Libel and Slander* § 117, at 420 (1995). Defendants contend that in order to determine whether the term "spirit of Satan" is defamatory—or truthful—as applied to Kliebenstein, a factfinder would necessarily be required to study and interpret church theology and beliefs concerning Satan. The contention brings us to the dispositive question on appeal: whether the phrase "spirit of Satan" has a secular meaning that could be applied in a civil suit for defamation without treading on—or wading into—religious doctrine.

Defendants rely heavily on an affidavit prepared by Rev. Dr. Elmer Colyer, professor of historical theology and Wesley studies at the University of Dubuque Theological Seminary. Professor Colyer asserts that terms such as "Satan" and "devil" have their roots in religious doctrine. His affidavit also reveals that these terms have evolved and now imply a variety of meanings between—and even within—religious denominations. Thus, in his words, "to determine *within any specific ecclesiastical context* whether the use of the term, 'spirit of Satan,' is defamatory . . . it is necessary to determine the meaning of the term for the religious community or body." (Emphasis added.)

The weakness in defendants' reliance on this expert opinion is that publication of the letter was not limited to a "religious community or body." Given the nature of plaintiffs' claims, the proper focus of our inquiry is not on the meaning of "spirit of Satan" within an ecclesiastical context but to determine whether the phrase has a secular meaning. In other words, could a fact finder determine whether Kliebenstein was defamed without resort to theological reflection?

Perusing a standard dictionary convinces us that the term used by church officials to describe Jane Kliebenstein may have religious roots but also carries a common, and largely unflattering, secular meaning. "Satan" is defined as "the great enemy of man and of goodness; the Devil: usually identified with Lucifer, the chief of the fallen angels." Webster's New World

Dictionary 1192 (3d ed.1994). Definitions of "satanic" and "satanism" include "characterized by extreme cruelty or viciousness" and "innate wickedness." Webster's Ninth New Collegiate Dictionary 1044 (1986). "Devil" has many dictionary meanings, including "an extremely wicked person: FIEND," *id.* at 347, and "a person who is energetic, mischievous, daring, or clever," American Heritage Dictionary 389 (2d ed.1985). The word "spirit" is defined as "an animating or vital principle held to give life to physical organisms" or, more simply, as "an inclination, impulse, or tendency of a specified kind: MOOD." Webster's Ninth New Collegiate Dictionary 1137 (1986).

We conclude from these definitions that the phrase "spirit of Satan" has meaning in a secular, as well as sectarian, context. Our conclusion is fortified by considering other cases in which associating a party with Satan has become an issue. In *State v. Tate*, 341 N.W.2d 63, 64–65 (Iowa Ct. App.1983), our court of appeals held a defendant charged with third-degree theft was denied a fair trial when the court refused his request to explain the contents of a book found in his possession upon his arrest, *Satan is Alive and Well on Planet Earth*. Based on the book's title and testimony by a police officer, the court concluded a jury could have believed the defendant was a "Satan worshipper," a fact "highly prejudicial to his case." *Id.* at 65. No sectarian discussion of religious dogma was needed for the court to determine that "[t]he prejudice to the defendant should have been obvious to the prosecutor." *Id.;* see also *Johnston v. Luebbers*, 288 F.3d 1048, 1061 (8th Cir.2002) (describing prosecutor's description of defendant as Satan "improper" and "inflammatory").

When similar accusations of being "in league with Satan" are made in the context of a church meeting called to determine whether a member should be "disfel-lowed," a court of appeals has affirmed the dismissal of a defamation claim against the church. *Howard v. Covenant Apostolic Church, Inc.*, 124 Ohio App.3d 24, 705 N.E.2d 385, 388–89 (1997). But where accusations of associating with "one of Satan's choicest tools" were lodged against a church member in a national newspaper covering the affairs of the church, the California Supreme Court held the statements were actionable where exaggerated and, therefore, unprivileged. *Brewer*, 197 P.2d at 716–17.

Because we are convinced that the phrase "spirit of Satan" has a secular, as well as sectarian, meaning, and because the accusatory phrase was used by defendants to describe Jane Kliebenstein in a communication published to more than just church members, we hold plaintiffs' claim of defamation should not have been summarily dismissed by the district court on constitutional grounds. We therefore reverse and remand for further proceedings.

**REVERSED AND REMANDED.**