# IN THE COURT OF APPEALS OF IOWA

No. 23-2117
Filed May 7, 2025

**DIANNE CHRISTOPHER,**
    Plaintiff-Appellant,

**vs.**

**ST. LUKE'S UNITED METHODIST CHURCH OF DUBUQUE, IOWA, STEPHANIE SCHLIMM, THE IOWA ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, SUSAN MCGOVERN, DAN JACOBSEN, GRACE ASHBROOK, SUSAN BETTCHER, CHRIS SCHRUMPF, JAYE JOHNSON, KIBOKO KIBOKO, HARLAN GILLESPIE and LAURIE HALLER,**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.

Dianne Christopher appeals the district court's grant of summary judgment in favor of the defendants on her claims alleging defamation and invasion of privacy. **AFFIRMED.**


Gary Dickey (argued) of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellant.

Amanda M. Richards (argued) and Martha L. Shaff of Betty, Neuman & McMahon, P.L.C., Davenport, and Johannes H. Moorlach, Jaki K. Samuelson, Anna E. Mallen, and Annie Reser-Moorehead (until withdrawal) of Whitfield & Eddy, P.L.C., Des Moines, for appellees.


Heard at oral argument by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**SCHUMACHER, Judge.**

This appeal arises from a church-related dispute in which Dianne Christopher alleged certain communications made by church officials were defamatory and amounted to false light invasion of privacy. Christopher appeals the district court ruling granting summary judgment in favor of St. Luke's United Methodist Church of Dubuque, Iowa (St. Luke's), Stephanie Schlimm, the Iowa Annual Conference of the United Methodist Church, Susan McGovern, Dan Jacobsen, Grace Ashbrook, Susan Bettcher, Chris Schrumpf, Jaye Johnson, Kiboko Kiboko, Harlan Gillespie, and Laurie Haller (collectively, the defendants). Christopher challenges the district court's conclusion that the underlying communications were protected under a qualified privilege for religious communications. Upon our review, we affirm.

## I.      Background Facts & Proceedings

The dispositive facts are undisputed.

## A.      Relation Among the Parties

Christopher is a "retired elder" of the United Methodist Church (UMC), a world-wide denomination of the Christian faith. Before retiring, Christopher served as a minister, a deacon, a licensed local pastor, and an elder, which was a clergy position within the UMC. In her pastoral role, Christopher provided specialized ministry at St. Luke's, a local UMC parish in Dubuque. Christopher retired as an elder in 2011 but remained at St. Luke's, participating in the parish's adult bell choir, attending worship services, and periodically providing guidance to congregation members.

Christopher is also a member of the Iowa Annual Conference (the Conference), a local regional body of the methodist church. The Conference is a governing body consisting of representatives from the local parishes and districts, which are sub-regional bodies, located within the Conference's geographic boundaries. St. Luke's is within the Conference's jurisdiction.

Like its sister conferences, the Conference has a cabinet made up of office-holding elders. These offices include the conference bishop, district superintendents, and directors of specialized areas. The Conference Cabinet's general purpose is to advance the mission of the UMC through oversight and counsel. This includes controlling what parishes UMC clergy members are appointed to and join. The parties agree:

> A fundamental role of the Bishop and Cabinet is to oversee and supervise the life of the local congregations and the ordained clergy in the Annual Conference. . . . This supervision extends into retirement: "All retired clergy members who are not appointed as pastors of a charge,[1] after consultation with the pastor and the district superintendent, shall have a seat in the charge conference and all the privileges of membership in the church where they elect to hold such membership except as set forth in the Discipline.[2]" A retired minister cannot simply choose which congregation they will join in retirement, that decision—as set forth in the Discipline—is subject to consultation with the district superintendent.

The defendants can be divided into one of two categories based on their organizational affiliation, those directly affiliated with the Conference and those directly affiliated with St. Luke's. In the first category are Laurie Haller, the Conference Bishop; Harlan Gillespie, Assistant to the Conference Bishop; Kiboko

---

[1] A "charge" is a specific UMC term that refers to a local parish, such as St. Luke's.
[2] The parties agree, the Discipline is a book that "set[s] forth the laws, plans, polity, and process by which United Methodists govern themselves," containing within it the rules governing the UMC.

Kiboko, District Superintendent for the geographic region encompassing St. Luke's; and Jaye Johnson, the Director of Congregational Excellence. These defendants (the Conference Cabinet defendants) were at all relevant times members of the Conference Cabinet. In the second category are Stephanie Schlimm, the Pastor of St. Luke's during all relevant events, and members of the St. Luke's Staff Pastor Parish Relation Committee (the St. Luke's Committee): Susan McGovern, Dan Jacobson, Grace Ashbrook, Susan Bettcher, and Chris Schrumpf.

Every local UMC parish is required to have a pastor parish relation committee like the St. Luke's Committee. These committees are liaisons between their parish's pastor and congregation and, in large parishes that employ staff, like St. Luke's, perform human resources duties. The duties of the committees include:

> encouraging, nurturing, supporting, and respecting the duties of the appointed pastor and staff members, as well as "to confer with and counsel the pastor(s) and staff on the matters pertaining to the effectiveness of ministry; relationships with the congregation, and [the pastor's health and self-care,] conditions that may impede the effectiveness of ministry."

The committees also assess the needs of their parish and, "ideally," work closely with their district superintendent to help their related conference cabinets appoint clergy to meet a parish's needs.

## B.    Underlying Events

In early April 2019, Christopher met with three members of the Conference Cabinet: Haller, Kiboko, and Gillespie. At this meeting, Haller told Christopher that Christopher could no longer attend St. Luke's. According to Christopher, Kiboko also said that a former St. Luke's pastor told Kiboko that he felt his ministry was

undermined by Christopher. Christopher was not given a deadline for leaving and did not immediately cease participation at St. Luke's. As Christopher expressed to Haller during the meeting, Christopher "[felt] a responsibility to the adult bell choir. You can't just take an F and a G out of the bell choir. There aren't many people standing around who play bells."

In September, Christopher again met with Conference Cabinet members. This meeting included Christopher, Haller, Kiboko, a nonparty cabinet officer, and a non-party former St. Luke's pastor, Chuck Layton. Haller again told Christopher she "should find another local church to attend due, in part, to Rev. Christopher's[3] role in affecting the term of ministers serving St. Luke's." Haller also told Christopher that the Conference Cabinet "would discuss Rev. Christopher's removal from St. Luke's."

In October, the St. Luke's Committee met for a special meeting. The following individuals were in attendance: McGovern, the committee chairperson; Jacobson; Ashbrook; Bettcher; and Schrumpf (the St. Luke's Committee defendants). Also in attendance were Conference Cabinet members Johnson and Kiboko and four additional members of the St. Luke's Committee who were either never named parties to this suit or have since been dismissed. This meeting resulted in a letter to Haller (the committee letter) signed by all committee members in attendance. The committee letter expressed support for efforts to exclude Christopher from St. Luke's and added, "[w]e are aware of a number of instances

---

[3] "Reverend" (abbreviated as "Rev.") is an honorific title used for members of the clergy in the UMC.

of her interference with the ministry of our clergy, staff and lay leadership." The letter then provided four "examples" of the alleged interference.

Thereafter, Haller wrote a letter to Christopher instructing that Christopher immediately cease participation at St. Luke's (the Haller letter). This letter referenced as attachments the committee letter and a document titled "Statement to the Congregation 10-27-19" (the Haller statement), which the letter said would be read to the St. Luke's congregation during services the following Sunday. McGovern, Schlimm, Kiboko, and Johnson were copied on the letter.

The Haller statement mentioned the decision to end Christopher's participation at St. Luke's. It explained Christopher was prohibited from attending certain activities at St. Luke's and attributed these decisions to Haller, the Conference Cabinet, and the St. Luke's Committee.

Christopher received a copy of the Haller letter, the Haller statement, and the committee letter as attachments to an email from Haller's office, sent by Haller's assistant, Gillespie (the Gillespie email).

Christopher responded via email to the Conference Cabinet defendants. Christopher alleged the Haller letter and Haller statement were defamatory and advised that reading the Haller statement as planned would result in legal action. The statement was never read to the congregation. But on the morning the statement had been scheduled to be read, Johnson shared copies of the Haller statement with the St. Luke's Committee members.

## C.    District Court Proceedings

Christopher brought this civil action against St. Luke's, Schlimm, the St. Luke's Committee defendants, and the Conference Cabinet defendants.

Christopher's petition contains forty-four counts based on either defamation or invasion of privacy.[4]  The events on which these claims were brought include the April 2019 meeting, the October St. Luke's Committee meeting, the committee letter, the Haller letter, the Haller statement, and the Gillespie email.

The defendants jointly filed a pre-answer motion to dismiss asserting failure to state a claim upon which relief may be granted.  *See* Iowa. R. Civ. P. 1.421(1)(f). The defendants claimed the underlying communications were protected by a religious communications privilege established by the First Amendment to the United States Constitution and the corresponding clauses of the Iowa Constitution. The district court denied the motion, reasoning it was too early in the litigation to determine whether the privilege applied.  The defendants' answer that followed asserted the same privilege as an affirmative defense.

Christopher's initial discovery requests were served on St. Luke's Committee member, Susan Hattel, who was then still a party to the case.  Hattel objected to many of the requests, asserting the information sought was privileged. Christopher filed a motion to compel.  After holding a hearing on the motion, on May 5, 2022, the district court issued a ruling with findings that distinguished which requests sought privileged information and which did not, granted the motion in part, and denied the rest.  Hattel was later voluntarily dismissed from the suit.  The remaining defendants have continued to assert privilege throughout discovery.

---

[4] The forty-four counts include nine specific causes of action: slander per se, slander per quod, slander by implication, libel per se, libel per quod, libel by implication, false light invasion of privacy, vicarious liability, and joint liability.

In July 2023, the defendants filed a joint motion for summary judgment. The defendants claimed the undisputed facts showed the underlying communications were made by and among church officials in their roles as such and pursuant to their common interest in Christopher's participation as a member of the St. Luke's congregation. They claimed this common interest entitled the underlying communications to protection by the religion clauses of the federal and state constitutions.

Christopher resisted, arguing any privilege that may have existed was lost by excessive publication when the communications were shared between the St. Luke's Committee members and the Conference Cabinet members. Christopher reasoned that St. Luke's and the Conference are legally separate organizations. Christopher also claimed a factual dispute remained over whether the defendants acted with actual malice, making summary judgment improper.

The district court granted the motion for summary judgment, determining the underlying communications were qualifiedly privileged and noting Christopher offered no evidence to support her actual malice argument. Christopher appeals.

## II. Standard of Review

"We review a district court's summary judgment ruling for correction of errors at law." *Koster v. Harvest Bible Chapel-Quad Cities*, 959 N.W.2d 680, 687 (Iowa 2021). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981. In reviewing a grant of summary judgment, "we are obliged to view the facts in the

light most favorable to the part[y] resisting the motion." *Kliebenstein v. Iowa Conf. of United Methodist Church*, 663 N.W.2d 404, 406 (Iowa 2003).

## III. Summary Judgment

## A. Legal Principles

## 1. Defamation and False Light Invasion of Privacy

False light invasion of privacy and defamation, which includes libel and slander, are overlapping theories of recovery. *Winegard v. Larsen*, 260 N.W.2d 816, 823 (Iowa 1977). Both claims require some degree of publication to a third party, though the degree required varies.[5] *See Bierman v. Weier*, 826 N.W.2d 436, 464–66 (Iowa 2013). Both also generally require a plaintiff to prove falsity.[6] *See id.* at 443, 465; *Gannon v. Halferty*, No. 18-2030, 2020 WL 1879690, at *3 (Iowa Ct. App. Apr. 15, 2020). And "'false light' cases are subject to the same constitutional restraints as defamation cases." *Jones v. Palmer Commc'ns., Inc.*, 440 N.W.2d 884, 894 (Iowa 1989), *overruled in part by Schlegel v. Ottumwa Courier*, 585 N.W.2d 217 (Iowa 1998).

---

[5] For defamation, the "publication" requirement is satisfied if the defamatory statement is communicated to even just one third party. *Bierman v. Weier*, 826 N.W.2d 436, 464 (Iowa 2013). In contrast, the false light element of "publicity" requires that the defendant's communication essentially broadcast the matter "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* at 466. Thus, while publication for defamation can be satisfied by a communication "to a single person or even to a small group of persons," the same will not satisfy publicity for false light. *Id.* (quoting Restatement (Second) of Torts § 652D cmt. A, at 384–85 (1977)).

[6] Defamation per se is an exception: falsity is presumed "when a statement has a 'natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse.'" *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 46 (Iowa 2018) (quoting *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996)). But the publication element must still be satisfied. *See id.*

**2.    Religious Communications Privilege**

Church-related controversies, by their nature, "implicate[] the Establishment Clauses of the federal and Iowa constitutions."  *Kliebenstein*, 663 N.W.2d at 406. Iowa follows the general rule that disputes of "purely ecclesiastical questions and controversies, including membership in a church organization," are not within a court's authority to decide.  *Id.* (quoting *Brown v. Mt. Olive Baptist Church*, 124 N.W.2d 445, 446 (Iowa 1963)).  Neither can courts resolve cases "involv[ing] solely the discipline or excommunication of [a plaintiff]."  *Id.*  But this limitation on a court's authority does not categorically preclude any church-related controversy from judicial resolution.  *Bandstra*, 913 N.W.2d at 38.  Courts must only refrain "from resolving internal church disputes that would require interpreting or deciding questions of religious doctrine."  *Id.*  Thus, the question that must be answered "is whether we can say 'the purportedly tortious conduct was not grounded in any religious belief or practice.'"  *Koster*, 959 N.W.2d at 688 (quoting *Bandstra*, 913 N.W.2d at 40).

In the context of church-related defamation claims, the Iowa Supreme Court has recognized the Establishment Clauses of our state and federal constitutions may render religious communications unactionable, even if they would otherwise be actionable, because of a qualified privilege.  *Bandstra*, 913 N.W.2d at 47.  Our supreme court recently reiterated the "general rule" of the religious communication qualified privilege:

> [T]he common interest of members of religious associations is such as to afford the protection of qualified privilege to communications between them in furtherance of their common purpose or interest. Thus, communications between members of a religious organization

concerning the conduct of other members or officers in their capacity as such are qualifiedly privileged.

*Koster*, 959 N.W.2d at 691 (alteration in original) (quoting *Kliebenstein*, 663 N.W.2d at 406–07). As a constitutional restraint on defamation claims, the same applies to false light claims. *Jones*, 440 N.W.2d at 894. But this privilege is not absolute and can be lost if the speaker's communication was done with actual malice or if the privilege was abused by excessive publication. *Bandstra*, 913 N.W.2d at 48.

**B.    Merits**

**1.    Excessive Publication**

Christopher concedes qualified privilege would apply if Schlimm and the St. Luke's Committee defendants communicated only among themselves and likewise with the Conference Cabinet defendants. But she argues any privilege was destroyed when the Conference Cabinet defendants shared communications with the St. Luke's Committee defendants and Schlimm and vice versa. She reasons, the Conference Cabinet defendants were not members of the St. Luke's congregation and neither Schlimm nor the St. Luke's Committee defendants were members of the Conference. The defendants disagree and argue the district court correctly determined the privilege remained because all defendants "shared a common interest in the membership of a St. Luke's member."

Excessive publication defeats the qualified privilege if the disputed communication was made to parties other than those with "a common interest in the subject matter of [the] communications." *Koster*, 959 N.W.2d at 693. There is no strict inter-congregation requirement, meaning the privilege is not necessarily

defeated simply because a communication is made to others who are not members of the same congregation. *See, e.g.*, *id.* at 692–93 (declining to find excessive publication when a party to the communication was an individual who was no longer a congregation member but who the court determined maintained a common interest in the subject matter). *But cf.*, *Kliebenstein*, 663 N.W.2d at 407 ("[I]f publication solely to church members justifies ecclesiastical status for otherwise defamatory communications, proof of publication to *non*-church members arguably supports the opposite conclusion."). "The qualified privilege for communications by religious organizations is essentially a variant of the common-interest privilege." *Koster*, 959 N.W.2d at 693. So long as no one other than those who "retain[] a common interest in the subject matter of [the disputed] communication" receive it, a religious communication's qualified privilege will not be defeated by excessive publication. *Id.*

Instead of looking strictly at membership affiliations, as Christopher urges we do, we must decide whether the Conference Cabinet defendants, Schlimm, and the St. Luke's Committee defendants shared a common interest in the subject of the communications. *See id.* This question can be answered by Christopher's own admissions.[7]

---

[7] Under different circumstances in which the plaintiff's admissions cannot resolve the issue but in which all defendants appear in their capacities as religious officials, such as here, second guessing whether the recipients of a communication have a "legitimate need to know about" the communication's subject matter may require "delving into the doctrine and practices of [the religious organization] and thus intruding into forbidden First Amendment territory." *Koster*, 959 N.W.2d at 692. Here, the purportedly tortious conduct was arguably grounded in religious belief or practice, as the content of the disputed communications concerns Christopher's impact on the mission of St. Luke's and Christopher's continued membership in the St. Luke's congregation. *See Kliebenstein*, 663 N.W.2d at 406 (identifying

Christopher's admissions make it clear the defendants all shared a common interest in her membership at St. Luke's. Christopher agrees one of the duties of the St. Luke's Committee is to support relations between the St. Luke's pastor and the St. Luke's congregation. She agrees it is the St. Luke's Committee's duty to share with the Conference Cabinet any concerns the committee may have over an elder's role in and impact on the parish. Christopher stated, the role of a pastor parish relations committee is, "ideally," to work closely with their district superintendent to help their conference cabinet appoint clergy to meet the parish's needs. The appointment authority remains even over retired elders. Christopher confirmed, "[a] retired minister cannot simply choose which congregation they will join in retirement"; the Conference Cabinet has a say.

Connecting these uncontested facts, if the St. Luke's Committee had concerns that an elder was negatively impacting the relations between the St. Luke's congregation and its pastor, the committee would be under a duty to discuss it with the Conference Cabinet—the organ of the UMC capable of remedying the issue by appointing the elder to a different parish. As a retired elder, Christopher's membership at St. Luke's was a matter of common interest to all defendants. Accordingly, there is no genuine dispute whether the underlying

---

disputes over "membership in a church organization" as forbidden, "purely ecclesiastical questions and controversies"); *cf. Koster*, 959 N.W.2d at 690 (finding the breach of fiduciary duty claim barred by religious immunity because resolution "would involve weighing of both [secular] standards and the norms by which the church is governed"). While both parties make statements that invite our discussion of religious immunity, any immunity argument is undeveloped, especially from the defendants. The focus of the parties' briefing is on qualified privilege. Insufficiently developed arguments are waived on appeal. *Baker v. City of Iowa City*, 750 N.W.2d 93, 102–03 (Iowa 2008); Iowa R. App. P. 6.903.(2)(a)(8)(3).

communications were destroyed by excessive publication. The qualified privilege was not destroyed on this ground.

### 2. Actual Malice

Alternatively, Christopher contends summary judgment was improper because a question remains whether the communications were made with actual malice. She asserts the purported reasons for excluding her from St. Luke's was "pretext for [the defendants'] desire to push Christopher out because of her past involvement in [a] complaint about Pastor Schlimm's husband."

For actual malice "to defeat a qualified privilege, a plaintiff must prove the defendant acted with knowing or reckless disregard of the truth of the statement." *Barreca v. Nickolas*, 683 N.W.2d 111, 121 (Iowa 2004). "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 123 (quoting *Caveman Adventures UN, Ltd. v. Press–Citizen Co.*, 633 N.W.2d 757, 761 (Iowa 2001)). Ordinarily, actual malice is not satisfied if the only evidence offered is a defendant's failure to investigate the veracity of a claim. *Id.* The plaintiff must offer more, such as evidence showing "a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

Whether a defendant published statements with actual malice "is ordinarily a matter for the jury, and in order to prevail on summary judgment the defendants must show there is no genuine issue of material fact that [the speaker] abused the qualified privilege." *Barreca*, 683 N.W.2d at 123.

The defendants claim the factual basis for the statements about Christopher's specific conduct is undisputed and the statements that her conduct was undermining the ministry of another pastor is immune from judicial intervention, as analyzing what constitutes interference with ministry and what is best for a parish would require interpretation of church doctrine and practices. We consider the statements in the six disputed communications in turn.[8]

### a. April 2019 Meeting (Counts XXXIV–XXXVI)

First, during the April 2019 meeting, Kiboko told Christopher that, upon leaving St. Luke's, one of the former St. Luke's pastors who ministered after Christopher's retirement said to Kiboko "that [Christopher] had undermined his ministry." Given the nature of the statement, if false, Kiboko's statement would clearly be made with Kiboko's knowledge of its falsity, and so the qualified privilege would be destroyed by actual malice.

Although Christopher requested information about Kiboko's statement during discovery, Kiboko objected to the discovery requests as privileged information. Christopher did not file a challenge to this privilege claim or otherwise call it into question.

Still, Christopher produced an affidavit from Layton, one of the former St. Luke's pastors who served the parish between Christopher's retirement and Schlimm's appointment, making him one of the potential speakers Kiboko could have been referencing. Layton's affidavit states he has no reason to believe

---

[8] The defendants dispute many of the spoken quotes attributed to them by Christopher occurred. For the purposes of summary judgment, we will presume the statements were made as alleged. *See Bandstra*, 913 N.W.2d at 48 n.4.

Christopher's removal from St. Luke's was warranted and he disagrees with the decision. But the record contains nothing to document efforts to obtain statements from the two other former St. Luke's pastors who, based purely on the time of their tenure at St. Luke's, would fit Kiboko's description of the speaker. Christopher has proffered no evidence beyond speculation to dispute the truth of Kiboko's claim or to establish obvious reasons to doubt it, such as evidence showing the statement was fabricated or the product of Kiboko's imagination. *See St. Amant*, 390 U.S. at 732. Accordingly, there is no evidence to create a genuine dispute that what Kiboko said was true.

We recognize that Christopher argues Kiboko's statement was pretext to rally support for excluding her from St. Luke's, but beyond Christopher's speculation, there is nothing to show Kiboko's statement was false or made with actual malice. Summary judgment is the "put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 808 (Iowa 2019) (alteration in original) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)); *accord Ballou v. Kurtenbach*, No. 21-1014, 2022 WL 2824286, at *1 n.1 (Iowa Ct. App. July 20, 2022). If the party opposing summary judgment is unable to present facts by affidavit essential to their resistance but could do so with more time, the party can request more time to produce the needed evidence. Iowa R. Civ. P. 1.981(6). Christopher has not done so here.

In short, there is no genuine dispute of material fact that Kiboko abused the qualified privilege by actual malice; the statement's qualified privilege stands.

### b. *October St. Luke's Committee Meeting (Counts I–VIII)*

Second, Christopher claims Johnson, Kiboko, and the St. Luke's Committee defendants made slanderous statements during the October St. Luke's Committee meeting. Christopher does not identify any particular statements alleged to have been made that would be actionable. The district court upheld Hattel's asserted privilege over statements made at this meeting, which Hattel asserted in response to interrogatory requests. Christopher did not file a challenge to any other defendant's privilege claim over the same or otherwise call such claims into question.

At the summary judgment stage, "the nonmoving party may not rest upon the mere allegations of his or her pleading but must set forth specific facts showing the existence of a genuine issue for trial." *Banwart v. 50th St. Sports, L.L.C.*, 910 N.W.2d 540, 545 (Iowa 2018) (quoting *Hlubek v. Pelecky*, 701 N.W.2d 93, 95 (Iowa 2005)). Without evidence of an allegedly defamatory statement, a defamation claim cannot survive summary judgment. *See Bandstra*, 913 N.W.2d at 46 (noting defamation generally requires a plaintiff "prove six elements: (1) publication, (2) *a defamatory statement*, (3) falsity, (4) maliciousness, (5) the statement was of or concerning the party, and (6) a resulting injury" (emphasis added)). Further, without offering evidence of a specific statement, there is nothing to establish as false—a required element for a prima facie false light claim.

As to her claims based on oral statements made during the October St. Luke's Committee meeting, because Christopher has not satisfied the false statement element required to make a prima facie case of defamation or false light, there is no issue of actual malice to decide. These charges fail as a matter of law.

### c.  Committee Letter (Counts IX-XI, XV-XVII, XXI-XXXIII)

Third, the committee letter stated, "[w]e are aware of a number of instances of [Christopher's] interference with the ministry of our clergy, staff, and lay leadership."  The letter then provided four bullet-pointed "examples":

- Manipulation and triangulation of clergy and lay leadership.
- Triangulation through the administrative staff.  (i.e., [Christopher] was included through a blind copy on oversight of worship bulletins.)
- While in a mentoring relationship with Pastor Chuck Layton, she made comments to church leadership exposing Pastor Chuck's vulnerabilities.
- She has continued to nurture pastoral relationships with congregants.

The defendants claim the truth of each of the bullet-pointed statements is supported by Christopher's admissions.  In her deposition, Christopher admitted that per her request, after her retirement she was blind copied on draft circulations of the Sunday morning worship bulletin.  She also testified she was a consultant to Layton during his tenure as St. Luke's pastor.  And she discussed concerns about church membership with the then-sitting St. Luke's Committee chairperson.  Christopher also said she continued to serve the St. Luke's parish until on or about October 21, 2019, when she ceased all participation.  Finally, one of the deposed committee members testified that she personally observed Christopher engage in the stated examples, except the statement concerning Layton.

As to the St. Luke's Committee's conclusions that this conduct qualifies as manipulation, triangulation, exposure of vulnerabilities, or nurturing a pastoral relationship, no evidence in the record suggests that these conclusions were made with actual malice.  To the contrary, deposition testimony from some of the signatories indicates those who signed the committee letter did so in good faith

and with a subjective belief in the truth of the statements, while nothing in the record provides evidence that any other members entertained subjective doubts as to the statements' truth.

There is no genuine issue of material fact that any committee member abused the qualified privilege by actual malice. Actual malice does not defeat the committee letter's qualified privilege.

### d. Haller Letter (Counts XII-XIV, XXI-XXXIII)

Fourth, the contents of the Haller letter provided an introduction for the committee letter, which was enclosed. The Haller Letter noted the St. Luke's Committee "cited ways in which [Christopher] continued to nurture pastoral relationships with congregation members and engaged in triangulation and manipulation of church members and clergy, even after [Christopher] ceased being their international interim pastor in 2001." Not only does this statement accurately convey the contents of the committee letter, but also Christopher offered no evidence that Haller entertained serious doubts as to the falsity of conclusions contained therein or had reason to doubt the veracity of their sources.

To the extent the letter contains any potentially actionable statements, there is no evidence of actual malice, and the Haller letter remains qualifiedly privileged.

### e. Haller Statement (Counts XII-XIV, XXI-XXXIII)

Fifth, the Haller statement says, "Haller, the [Conference] Cabinet, and the [St. Luke's Committee] believe that it is in the best interest of St. Luke's United Methodist Church for Rev. Dianne Christopher to end her participation in the congregation, effective immediately." As discussed above, the decision was based on conduct shown by the record to be substantially true. Though Christopher may

disagree with the conclusion about the parish's "best interests," this statement reflects the defendants' subjective belief about the impact of Christopher's conduct.

For the same reasons we find no actual malice as to the committee letter or the Haller letter, there is no genuine issue of material fact that Haller abused the qualified privilege with the Haller statement. The qualified privilege remains intact.

### f. *Gillespie Email (Counts XVIII-XX)*

Sixth, the Gillespie email itself contains no statements capable of being actionable. To the extent any liability may arise, it would be only from republication of the Haller letter, the Haller statement, and the committee letter, which were attached to the email. No evidence indicates Gillespie acted with actual malice in sending the email and attachments. And, as previously discussed, there is no evidence creating a genuine dispute of actual malice on any of the included documents.

Actual malice does not defeat the Gillespie email's qualified privilege.

## 3. Vicarious and Joint Liability Claims

Christopher has presented no argument beyond her challenges to qualified privilege that would support a challenge to the district court's ruling on her vicarious and joint liability claims. Having determined the underlying communications are all qualifiedly privileged, we affirm summary judgment in favor of the defendants on these remaining counts.

**IV.    Motion to Compel**

**A.    Jurisdiction**

The defendants assert we are without jurisdiction over Christopher's challenge to the motion to compel because Christopher neither identified this issue nor referenced the May 2022 district court order in her notice of appeal, which stated, "Christopher appeals to the Supreme Court of Iowa from the final order entered in this case on November 30, 2023, and from all adverse rulings and orders therein."

"[A] notice of appeal must specify . . . the decree, judgment, order, or part of the decree, judgment, or order appealed from."  Iowa R. App. P. 6.102(2)(a). Failure to file a notice of appeal that "substantially complie[s] with our rules and sufficiently notifie[s] the appellee of the nature of the appeal" may result in a lack of jurisdiction on appeal.  *Iowa Dep't of Hum. Servs. ex rel. Greenhaw v. Stewart*, 579 N.W.2d 321, 324 (Iowa 1998); *see, e.g.*, *State v. Boyer*, No. 18-1892, 2020 WL 2108129, at *1–2 (Iowa Mar. 12, 2020).  But

> [n]otices of appeal should be liberally construed so as to preserve the right of review, and permit, if possible, a hearing on the merits. . . .  Thus, as long as the opposing party is not misled to his irreparable harm, a notice of appeal which can reasonably be construed as an attempt in good faith to appeal from an appealable decision is sufficient.

*Greenhaw*, 579 N.W.2d at 323–24 (quoting 4 C.J.S. Appeal & Error § 371, at 421 (1993)); *see also Kelly v. Englehart Corp.*, No. 99-1807, 2001 WL 855600, at *2 (Iowa Ct. App. July 31, 2001) ("If one can infer from the notice of appeal an intent to appeal from the judgment and the appellee has not been misled, the appeal will be entertained.").

We are unpersuaded by the defendants' lack-of-jurisdiction argument. The defendants do not claim they were misled to their irreparable harm or that they were unaware of Christopher's intent to appeal the motion-to-compel ruling once the district court issued a final judgment. Christopher's notice of appeal specifically challenges the district court's summary judgment ruling—which was issued after the ruling on the motion to compel—"and from all adverse rulings and orders therein." "Given the course of the district court proceedings, we believe defense counsel could discern [Christopher's] intent to appeal both rulings and were not misled by the omission in the notice of appeal." *Kelly*, 2001 WL 855600, at *2.

Even so, we find a separate jurisdiction issue not addressed by either party. Under Iowa Rule of Civil Procedure 1.943, Christopher voluntarily dismissed with prejudice all claims against Susan Hattel, the only defendant against whom the motion to compel was brought. "[A] voluntary dismissal under rule 1.943 is final and terminates the court's jurisdiction of the action. After voluntary dismissal, the case is considered 'nonexistent' and the matter usually deemed 'unreviewable.'" *Lawson v. Kurtzhals*, 792 N.W.2d 251, 255 n.2 (Iowa 2010) (citations omitted). An exception permitting appellate review exists when the dismissal "is not as favorable as the judgment the defendant sought." *Id.* But nothing in the record indicates this exception applies here. And although the case continued with jurisdiction over the claims against the remaining defendants, it is unclear whether we retain authority to review a motion that concerned only a defendant who Christopher later voluntarily dismissed with prejudice.

Rather, the dismissal with prejudice benefitted Hattel by absolving her of liability and shielding her from the discovery burden imposed on parties to a case.

The ruling on the motion to compel only concerned discovery requests submitted to Hattel. Specifically, because Hattel did not have any of the documents requested by Christopher, the motion was limited to only Hattel's responses to interrogatories. This limit to interrogatories is clearly stated on the face of the district court ruling and supported by the parties' statements at the hearing on the motion, recorded in the hearing transcript. Ten months after the ruling on the motion, Christopher voluntarily dismissed all claims against Hattel, with prejudice, under rule 1.943.

Christopher has not provided any authority allowing a court to compel a non-party to submit responses to interrogatories. *See* Iowa R. Civ. P. 1.509 (limiting use of interrogatories to the parties to the litigation); *see In re Dethmers Mfg. Co.*, 985 N.W.2d 806, 815 (Iowa 2023) (emphasizing the need to protect nonparties from the burdens of discovery); *Ronnfeldt v. Shelby Cnty. Chris A. Myrtue Mem'l Hosp.*, 984 N.W.2d 418, 427–28 (Iowa 2023) (recognizing a rule 1.943 dismissal generally ends a court's authority over the dismissed party). Accordingly, after Christopher dismissed Hattel, she was no longer subject to interrogatory requests and the district court's ruling on the motion to compel Hattel to submit interrogatory responses became moot.

## B. Error Preservation

Even if we were to assume we have jurisdiction to consider this issue as it relates to the remaining defendants, the defendants contend Christopher did not preserve error. They argue Christopher was required to file an affidavit indicating a need for more time to discover facts to rebut the defendant's summary judgment

motion. *See* Iowa R. Civ. P. 1.981(6). Without asserting an opinion on the defendants' argument, we agree error is unpreserved for a different reason.

The challenged motion to compel was only against Hattel; Christopher has not shown us where in the record she challenged the remaining defendants' assertion of privilege in their discovery responses. The record shows Hattel was the first defendant to receive discovery requests. Hattel's answer to that request was the basis for the motion to compel. The district court issued its ruling on the motion on May 10, 2022. The record indicates Christopher did not serve discovery requests on any other defendant until after the district court's ruling. In their responses to Christopher's requests for interrogatories and production of documents, these defendants asserted the same privilege raised by Hattel and submitted privilege logs. But Christopher does not assert she challenged any of these claims of privilege,[9] and we find no evidence of such a challenge upon our review.

---

[9] Christopher's appellant's brief states:

> Christopher served interrogatories and requests for production into statements made at the October 10, 2019, [St. Luke's Committee] meeting. Defendants refused to comply with the discovery requests on the basis that the communications at issue "fall under the religious communications privilege." Following a hearing on the discovery dispute, the district court granted Christopher's motion to compel in part and denied it in part. As relevant to this application, the court denied Christopher's interrogatories related to "statements made during the [St. Luke's Committee] meeting" on the basis that they are "qualifiedly privileged."

(Record citations omitted.) The record before us does not support Christopher's presentation of the procedural facts, which implies the motion to compel and district court order included the remaining defendants in addition to Hattel. Although we agree the remining defendants asserted the same privilege and indeed cited the district court's May 10 ruling on the motion to compel, Christopher never challenged these later assertions of privilege.

"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Iowa R. Civ. P. 1.503(1). When a recipient of a discovery request objects to the request and asserts a privilege, the requesting party may challenge the response by filing a motion to compel. Iowa R. Civ. P. 1.517(1). Once challenged, if the party opposing disclosure has made the preliminary showing required to establish a presumption of privilege then the district court has discretion to grant an in-camera review of any documents to determine the scope of the privilege to the individual documents. *Lamberto v. Bown*, 326 N.W.2d 305, 309 (Iowa 1982); *see, e.g.*, *Bandstra*, 913 N.W.2d at 51–55.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). "The district court must explicitly rule on the issue to be appealed, passing reference to similar topics is insufficient." *Rheeder v. City of Marion*, No. 20-1116, 2021 WL 5458481, at *8 (Iowa Ct. App. Nov. 23, 2021) (citing *Addison Ins. Co. v. Knight, Hoppe, Kurnik & Knight, L.L.C.*, 734 N.W.2d 473, 480 (Iowa 2007)). Regardless, error is preserved when a district court ruling "indicates that the court *considered* the issue and necessarily ruled on it." *Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012).

There is no possibility the district court's May 10 ruling on the motion to compel considered the defendants' privilege claims—the discovery requests to the remaining defendants had not yet been submitted. Neither do we find in the record any ruling by the district court confirming or rejecting the defendants' asserted privilege once those requests were sent. Rather, the defendants' assertion of

privilege went unchallenged and unreviewed by the district court. According to the record, Christopher implicitly accepted the defendants' claim of discovery privilege.[10]

Christopher now claims the district court ruling "kneecapped" her ability to obtain evidence to fight the defendants' summary judgment motion. But as explained above, the challenged ruling only governed the interrogatories sent to Hattel. If Christopher wanted to challenge the remaining defendants' objection to discovery and assertion of privilege, she could have raised the issue with the district court before discovery closed. *E.g.*, *Bandstra*, 913 N.W.2d at 53–54. To the extent Christopher's challenge on appeal concerns the remaining defendants, because she did not challenge the defendants' discovery responses asserting privilege, we have no district court ruling to review.

## V.    Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the defendants.

**AFFIRMED.**

---

[10] To be sure, we note also that Christopher has not presented any argument that she was not required to challenge these later claims of privilege to preserve error. *See, e.g.*, *Bandstra*, 913 N.W.2d at 54 (determining plaintiffs were entitled to in cameral review of the redacted portions of defendant's document when the defendant redacted more than was ruled privileged after a first motion to compel and the plaintiffs challenged the excessive redaction through a second motion to compel within the discovery period); *see also PaineWebber Grp., Inc. v. Zinsmeyer Trs. P'ship*, 187 F.3d 988, 992 (8th Cir. 1999) ("When a party claims that certain documents are privileged and provides a list or log of those documents, the other party, the one seeking discovery, must take the initiative, for if the party seeking discovery does not press for *in camera* review of a particular document, the process ends with the claim of privilege *de facto* upheld.").